**People of the State of Illinois, Plaintiff-Appellee,
v. Hubert W. Brown, Defendant-Appellant.**

Gen. No. 11,105.

Fourth District.

July 23, 1970.

337

Phillip D. Wynn, of Carlinville, for appellant.

Thomas P. Carmody, State's Attorney of Macoupin County, of Carlinville, for appellee.

RICHARD MILLS, J., delivered the opinion of the court.

Brown was indicted in separate counts for theft and criminal damage to property, both of the felony rank. A jury of peers adjudged him guilty on both counts. He was granted three years' probation, with nine months at the State Farm as a condition thereof.

This cabal had its inception when some 460 pounds of #9 bare copper wire were cut down from the communication lines of the Chicago, Burlington & Quincy Railroad in Macoupin County. The scenario occurs on four days in February, 1968, being a Friday, Saturday, Sunday and Monday, February 2, 3, 4 and 5. The actors are Bradford, Davis, Cantrell and Brown. Upon the trial, the plot unfolded thusly:

On Friday night, the quartette left Kennett, Missouri, in Brown's white Pontiac and drove to Chicago. Brown purchased a black Dodge convertible on Saturday in Chicago in the company of the other three, and then they all drove southward in both automobiles (two in each car) until they stopped in the middle of the afternoon on Saturday at a truck stop at Bloomington, Illinois. Brown gave the others $5 and instructed them to purchase some wire cutting pliers, which they did. During the early evening of Saturday, all four drove in the black Dodge over to Pekin, then later returned to the Bloomington truck stop where they stayed overnight using the free bunk quarters for truckers. The next morning, Sunday, they drove both cars on south to the general area of the crimes and searched for wires to cut. They parked the black Dodge at the junction of U. S.

Route 66 and Illinois Route 48, a few miles north of Litchfield, and all rode in the white Pontiac the few miles to where the C B & Q tracks cross State Route 108. Bradford served as lookout while Brown, Davis, and Cantrell proceeded to cut down the copper wire from the C B & Q lines. While the criminal acts were being perpetrated, law officers appeared at the scene. Brown sounded the alarm and the covey flushed. Bradford and Davis fled in the white Pontiac and were later apprehended after a high-speed chase. Brown and Cantrell ran off into the darkness and made their way back on foot the distance of about four miles to where the black Dodge had been left. Brown and Cantrell then drove back to Kennett, Missouri, during the early hours of Monday morning.

Brown interposed a defense of alibi, maintaining that: Cantrell was not with the other three on the trip; that he (Brown) went out with two girls in Bloomington on Saturday evening, did not drive to Pekin, left the truck stop after 11:30 p. m. on Saturday evening, drove to Missouri and arrived at Kennett at approximately 9:00 a. m. Sunday morning. After the jury verdict of guilty on both charges, Brown filed a post-trial motion for a new trial based on newly discovered evidence, which was denied. And now on this appeal Brown contends that (a) the trial court erred in denying a new trial because of newly discovered evidence, (b) that the value of the copper wire was not proved, and (c) that he was not proved guilty beyond a reasonable doubt. On the other hand, the People's theory is: Brown did not exercise reasonable diligence in discovering the "new" evidence, which was merely cumulative anyway; the value was adequately proved; and defendant was proved guilty beyond a reasonable doubt.

First of all, let us survey the motion for new trial based upon newly discovered evidence. To support the

motion, Brown submitted the testimony of Harvey Warren (an attendant at the truck stop in Bloomington), a payroll sheet from the truck stop, the statement of Carol Ward (one of the girls Brown said he had a date with on Saturday night), and a gasoline purchase receipt from "Jim" (at Uniontown Oil Co., Uniontown, Missouri), as well as affidavits of the defendant and his counsel.

Warren directly contradicted prosecution's trial witness, Robinson, who was also an attendant who worked at the Bloomington truck stop. Warren maintained that he, not Robinson, worked the night shift of Saturday–Sunday, and that he last saw Brown between 10:00 and midnight Saturday. Now, both Brown and his counsel were aware of the existence and identity of this possible witness prior to trial, and even on the night before the jury was selected defense counsel talked with Warren on the telephone. At no time was Warren subpoenaed to testify on behalf of the defense. As a matter of fact, defense maintains that although counsel talked with Warren, they did not know where to locate him. The following appears in the report of proceedings on the motion for new trial:

> MR. DOBBS: "Mr. Warren, I talked to you on the phone in July. You did tell me that you didn't want to get involved in this, didn't you?"
>
> WITNESS: "That's correct. I don't—."
>
> MR. DOBBS: "The only information you had would be that Hubert left the station while you were still there?"
>
> WITNESS: "That's all I could say, yes."
>
> MR. DOBBS: "Do you recall whether or not I asked you for your address?"

WITNESS: "I don't remember that you asked or that I refused to give it to you. I told Mr. Schwartz because I hadn't refused to get it—give it to anybody. I don't remember you asking for it. I don't remember refusing to give it to you."

MR. DOBBS: "I think that's all."

THE COURT: "You may step down."

Brown maintained that he had a date with a girl that Saturday evening in question, but it wasn't until his counsel talked with Harvey Warren the night before trial that they discovered her name. Carol Ward said in her statement that she had known Brown for about a month, was out with him on the Saturday evening in question, returned with him to the truck stop at 11:30, left him there and went out for another drink. When she returned an hour later, Hubert wasn't there.

A "payroll account time sheet" from the truck stop firm was also offered to support the motion for new trial. It reflected that both attendants, Robinson and Warren, worked on February 2, 3 and 4. It does not indicate what hours or what shift either of them worked.

The gasoline receipt from Uniontown, Missouri, is dated "2/4, 1968," was made out to "cash," and simply signed by "Jim." Brown's affidavit states that although he and both of his attorneys interviewed "Jim" in Uniontown six days before the hearing on the motion for new trial, none of them "thought to obtain the last name of this individual."

 "Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by the

court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there has been no lack of diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse." People v. Holtzman, 1 Ill2d 562, 569, 116 NE2d 338, 342. "A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge and denial thereof will not be disturbed upon review in the absence of a showing of an abuse of discretion. . . . To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence." People v. Baker, 16 Ill2d 364, 158 NE2d 1, 6; see also, People v. Dukes, 19 Ill2d 532, 169 NE2d 84, 87.

The law in Illinois seems to be unmistakably clear: a request for new trial based on newly discovered evidence is subjected to the most cautious and circumspect exploration, must sustain the burden of showing proper and timely perseverance and diligence, must demonstrate that the evidence could not have been uncovered or revealed earlier with due vigilance, must yield proof not merely cumulative to the evidence on trial but reflecting a conclusive and final quality that would likely change the verdict, and, ultimately, is a matter reposing within the sound discretion of the trial bench—the exercise of which will not be altered unless manifestly abused.

██ By any test, the motion for new trial was properly denied by the trial court. The existence of Harvey Warren (and through him Carol Ward and the payroll sheet) was not only known to Brown and his counsel, but his lawyer actually talked with Warren by phone prior to trial. From the above colloquy between defense

counsel and Warren herein recited, it seems obvious that little effort, if any, was made to have Warren present before the jury. Certainly no subpoena was issued for his testimony. And as to "Jim" in Uniontown, Missouri, there is absolutely nothing in this record that would give the slightest reason, valid or invalid, why his gasoline receipt to "cash" was not available at time of trial. By no stretch of the imagination can it be said that any of this was "newly discovered evidence" since on its face it had already been discovered prior to trial (Warren), or could have been discovered prior to trial by the simple exercise of due diligence.

This alleged "newly discovered evidence" must also fall by the wayside since it failed to be of such a conclusive character as to probably change the result upon retrial. All of the statements and testimony of Harvey Warren and Carol Ward, the data on the payroll sheet and the affidavits concerning "Jim" in Uniontown, Missouri, even if admissible and sufficiently timely, would merely be cumulative of testimony already presented. The jury viewed a parade of witnesses called by defendant to corroborate his defense of alibi, and had ample opportunity to ponder such testimony for its vague, ambiguous and ephemeral qualities. The sum and substance of all this tendered material simply runs to the alibi defense of Brown, is cumulative as to, and directed solely to, that issue of alibi, could in no way be considered conclusive in character and would probably not change the result of this case on retrial. There was no "manifest abuse" of discretion by the trial court, and the mislabeled "newly discovered evidence" was properly rejected. It was neither new nor conclusive—it was both old and cumulative.

Next, the State's proof of value of the copper wire is challenged. Witness Carpenter, over defendant's objection, testified at trial as to the replacement cost of the copper wire and also as to the scrap value of the

343

wire on February 4. A special agent for the C B & Q for 30 years, he stated that he obtained the replacement cost from the railroad's communication department, and the amount of scrap value "from the detective on the Junk and Freight Squad of the St. Louis Police Department." Brown, in his brief, contends "That the testimony of Carpenter as to the replacement cost and the scrap value of the copper wire is 'hearsay' is too obvious for comment, and as such should not have been admitted over defendant's objection." He does not see fit to cite any decisional authority, however, as to why such hearsay cannot be admitted. To acknowledge that it is hearsay is to concede the obvious. Yet, we find countless illustrations in the annals of criminal law where hearsay evidence is readily, properly and validly utilized. To simply cry "Hearsay, Hearsay" is akin to the allegorical "Wolf, Wolf." There is ofttimes a similar dearth of cause for alarm.

 We recall that in People v. McCoy, 101 Ill App 2d 69, 242 NE2d 4, 6, we stated that "The fundamental purpose of the hearsay rule was and is to evaluate the quality of the evidence by subjecting the source of the assertion to cross-examination by the party against whom it is offered. Absent the opportunity for cross-examination and in the face of an appropriate objection, the objection must be sustained and the proffered evidence rejected." We note in the instant case on appeal that not only was defendant given an opportunity to cross-examine Carpenter, but that upon such cross-examination he asked not one question concerning the value of the wire, the basis or source of the information, or any other aspect of this question. Wharton's Criminal Evidence, Volume 1, § 276, "Value," asserts that "When the nature of the offense or the punishment varies with the value of the property which has been affected, hearsay or reputation evidence in the form of the market value of the property is admissible. The prosecution is not

344

restricted as to the use of such evidence, and any evidence from which the jury can reasonably infer value is admissible." Defendant has failed to show this court any authority to the contrary.

The People's other witness as to value was Mr. Hopper, who testified that he worked for a scrap metal and junk firm and that for 15 years his firm had bought and sold copper wire in the area at least once a week. Defendant did not cross-examine Hopper. But Brown did object to the allowance by the trial court of the addition of Hopper to the list of witnesses for the state. It is true that Hopper's name was not endorsed on the original list of witnesses for the people, and that it was only during the course of the trial that the state's attorney asked leave of court to add his name. But it is also noted that both in chambers on the record, and in open court on the record, the trial judge made the witness available to defendant's counsel for examination. At neither time was the offer accepted, and (as already pointed out), defendant's counsel did not see fit to cross-examine Hopper at all.

The permission of a witness to testify is purely a discretionary matter and has been so held upon numerous occasions by our courts. "The rule is firmly established that it is within the discretion of the court to allow a witness to testify whose name is not on the list furnished to the defendant and this discretion will not be reviewed unless it appears the defendant has sustained the burden of showing surprise or prejudice." People v. LaCoco, 406 Ill 303, 94 NE2d 178, 184; People v. Hopkins, 29 Ill2d 260, 194 NE2d 213, 216. Here, Brown has shown neither surprise nor prejudice. An analogous plight arose in the LaCoco case, where the court said: "In view of the circumstance that defendants were afforded an opportunity to talk to Lusader, did not ask for a continuance, or make any showing of prejudice and proceeded with the trial, it cannot be said that

the trial judge abused his discretion in permitting Lusader to testify." (P 184.) A like situation, and identical ruling, occurred in People v. Knox, 94 Ill App2d 36, 236 NE2d 384, 387. We conclude that the trial judge did not misuse his discretion in permitting the witness Hopper to testify, and since defendant in this appeal does not challenge the expertise of Hopper's valuation testimony, it is not necessary for us to proceed further with the question of value. It was quite adequately and suitably established.

Lastly, Brown argues that the state failed to prove him guilty beyond a reasonable doubt. We have carefully and minutely examined the record in this appeal, and come to but one unassailable finale: there was ample evidence for that body of peers to conclude that Brown owned the car, planned the trip, planned the crime, directed the purchase of the wire cutters, selected the site of the offense, was present at the scene, showed his accomplices how to cut and roll the wire, performed much of the work himself, sounded the alarm when the police arrived and then escaped on foot. There was abundant testimony from which the jury could, and did, deduce that defendant's alibi was cut out of whole cloth. Even in his own testimony, Brown corroborated much of the testimony of the accomplices, Bradford, Davis and Cantrell, relative to the trip. The jury chose to continue to believe the trio, and disbelieve Brown, on the points of variance.

 We hold that there was ample and sufficient evidence to establish guilt beyond a reasonable doubt, and that the trial court committed neither error nor an abuse of discretion in refusing to grant a new trial on the basis of newly discovered evidence. The judgment of the Circuit Court is affirmed.

Affirmed.

SMITH, P. J. and TRAPP, J., concur.