City of Chicago, a Municipal Corporation, Appellee, v. Jacob Hadesman, Appellant.

Gen. No. 47,369.

First District, Third Division.

April 9, 1958.

Released for publication May 9, 1958.

Epton, Scott, McCarthy & Epton, of Chicago (L. Louis Karton, of counsel) for defendant-appellant.

John C. Melaniphy, Corporation Counsel of city of Chicago (Sydney R. Drebin, and James C. Murray, Assistant Corporation Counsel, of counsel) for plaintiff-appellee.

JUSTICE FRIEND delivered the opinion of the court.

These consolidated proceedings arose as the result of an inspection of a building located at 4719–23 South

Kenwood Avenue in the city of Chicago by a team of city building, health and fire inspectors. About one month after the inspection, five complaints were filed charging thirty violations of various city ordinances in the maintenance of the forty-three flat building occupied by over 100 persons and owned by defendant. The five complaints were consolidated and tried by the court without a jury, resulting in judgments imposing fines aggregating $3,000, computed at the rate of a $100 fine on each count. No fine was entered on the blanket count in each complaint charging continuing violations to the date of suit. Motions to vacate and for new trial were overruled, and defendant appeals.

As ground for reversal, it is first urged that the judgments should be reversed because the city failed to prove the violations alleged in the complaints by a clear preponderance of evidence. There is no validity to this contention because it appears that when the cases were called for trial, and prior to the introduction of any evidence, counsel for defendant several times stated to the court that his defense was going to be compliance with the ordinances after notification of violation. In support of this defense, and for the purpose of mitigating the fines provided by the Code, he introduced into evidence bills showing payment for work done in the building to comply with the ordinances. He had stipulated to some eighteen of the thirty violations; with respect to the remaining twelve upon which fines were imposed, the record discloses proof supporting the trial court's judgments which is not contradicted by any evidence in the record. The city requested the court to impose the maximum fine of $200 on each of the thirty counts, an aggregate of $6,000. At the conclusion of the hearing, the trial judge stated that he had taken into consideration the fact that defendant had moved to correct the violations after they were brought to his attention, and

152

reduced the fine to $100 on each of the thirty counts, or an aggregate of $3,000. It was not until after the court had indicated the amount of the fines to be imposed, and after defendant failed to obtain the leniency he had hoped for, that his counsel raised the question of the sufficiency of the evidence.

 The rule is well settled in this state that a case on appeal must be reviewed and decided on the theory on which it was tried; a party cannot try a case on one theory in the trial court, and on another in the court of review. Blanchard v. Lewis, 414 Ill. 515; Davidson v. Whitman, 336 Ill. App. 333. In the latter case the court pertinently stated: "Subject to a few exceptions, the rule is of almost universal application that questions of whatever nature, not raised and properly preserved for review in the trial court, will not be noticed on appeal, and that where counsel declares on trial in open court that only a certain question is involved in the case . . . other questions cannot be raised in the Appellate Court." See also In re Estate of Leichtenberg, 7 Ill.2d 545.

Among the many violations for which fines were imposed, some relatively trivial and others of a serious nature, there are three with a maximum fine prescribed by the ordinance as $50. The fines on count 1 of case 400,961, count 1 of 400,959, and count 2 of 400,962, entered in the amount of $100 each, were limited by ordinances to a maximum of $50 each. As to these, the total judgment for $300 should be reduced by $150.

██ Defendant's remaining contention is that the city failed to comply with the ordinance requirements, as he interprets them, that it give the property owner notice of the existence of violations before suit is filed. This contention was not urged on trial, but since defendant devotes a considerable portion of his brief to its support, we feel constrained to consider it. He cites

153

section 12—30 of the Municipal Code which provides for a fifteen-day notice by the division marshal of the bureau of fire prevention of violation of fire ordinances and regulations, section 39—6 of the Code which affords injunctive relief in the event that "after due notice" the owner or owners of the building do not conform with the provisions of the Code, section 41—7 of the Code which provides for informal action by the commissioner of buildings or the fire commissioner to secure correction of any violations of the Code provisions, as well as several other sections of the Code. These Code provisions were evidently adopted for the purpose of obtaining voluntary compliance, and are similar to compliance regulations of an administrative agency; they are not judicial in the sense that notice is mandatory as a prerequisite to suit.

It is urged by defendant that the method employed in these cases presents a departure from the city's traditional practice; that the record shows a descent upon defendant's building of a team of inspectors from the health, electrical, building and fire prevention departments; that the city did not put in evidence any notices which it served thereafter on the defendant; and that, in fact, he was merely notified after the inspection that the inspectors had found specified violations. To refute defendant's argument the city relies on City of Chicago v. Atwood, 269 Ill. 624. In a supplemental brief filed after oral argument, the city points out that counsel for the respective parties here were unaware of the provisions of the Municipal Code relating to notice in existence at the time of the rendering of the decision in the Atwood case, and they quote extensively from the provisions of the Municipal Code of 1911 which were in effect at the time that opinion was filed—the ordinances were substantially similar to the present ordinances in the matter of notice; and the decision affords strong support to the city's contention that suit can be commenced and

maintained for violation of a municipal ordinance without first serving and proving notice to the owner or occupant of the building. Defendant, in an effort to minimize the force of the Atwood opinion, suggests that inasmuch as there is nothing in the opinion to indicate that the court was informed of the requirement of notice, its holding that notice was not necessary may have been made without knowledge of the facts. Such an assumption, if only for pragmatic reasons, cannot be indulged; rather, it must be presumed that the court was familiar with existing ordinances. The New York courts under similar statutes and circumstances have held that resort to administrative procedure is not an essential prerequisite to institution of criminal prosectution for unlawfully emitting dense smoke (Consolidated Edison Co. v. Murtagh, 280 App. Div. 221, 112 N.Y.S.2d 681; People v. Tatje, 121 N.Y.S.2d 147). In discussing Consolidated Edison Co. v. Murtagh, defendant argues that its holding was nullified, in practice, by dictum in the later and similar case of People v. Consolidated Edison Co., 116 N.Y.S.2d 555, where the court commented that "Reasonable opportunity to effect the changes that are presently being made had been given to the defendant"; defendant reasons that although the court may technically have held (following the Murtagh opinion) that notice was not required, it sanctioned the practice of giving such notice before instituting suit. But People v. Tatje was decided subsequent to the second Consolidated Edison Company case, and in the Tatje decision the court, again following the Murtagh opinion, unequivocally held that resort to administrative procedure is not an essential prerequisite to the institution of criminal prosecution for unlawfully emitting dense smoke.

 ■ An examination of the provisions of the Municipal Code of Chicago relative to fire and building regulations discloses that the provisions relative to

the giving of notice merely afford a course of procedure for administrative officials in the enforcement of city building, fire and health regulations and were not intended to supplant the historic right of a municipality to sue for a penalty for violation of its ordinances. There is nothing in the Municipal Code of Chicago which would give defendant the right to violate provisions of the Code until notified; its provisions clearly make a violation subject to fine. If we were to accept defendant's theory it would serve to encourage noncompliance without fear of suffering penalties until notice of violation had been served.

Defendant's was one of the first buildings inspected under a new method and theory of enforcement of city ordinances relating to the health, safety and welfare of occupants of multiple-housing units. The purpose of team inspection and subsequent suits to recover penalties under this new method of enforcement is not disclosed in the record, but it is clearly a proper and laudable exercise of the police power of a city to eliminate slum conditions and danger to the health of city residents resulting therefrom. The practice has been, as defendant says, for the city to allow housing violations to accumulate over a long period of time without prosecution. It was a bad practice, however, and it seems odd that the courts should be asked to perpetuate such a disregard of human rights for the reason that they have been so disregarded for many many years. It is common knowledge that within the past several years the cost of fires in unsafe buildings has had to be computed, not only in terms of dollars and cents, but in lives lost and tenants injured. And the dollar-and-cent cost, ironically, has been borne largely by the tax-paying public because of the disproportionate share of fire—and health and police services as well—necessarily provided for the areas in which such buildings are located. We think that the mass-

156

inspection procedure of inspection signalizes an awakening on the part of those responsible for the enforcement of fire, health and safety ordinances. It seems logical to assume that the mass-inspection method, which is the most thorough-going type of inspection undertaken to date, reflects a growing social consciousness on the part of city officials in behalf of lower-bracket income occupants of multiple-housing units. John Donne in the seventeenth century might well have been writing for the social-conscious twentieth century: "No man is an island entire of itself; every man is a piece of the continent, a part of the main. If a clod be washed away by the sea, Europe is the less, as well as if a promontory were, as well as if a manor of thy friend's or of thine own were. Any man's death diminishes me, because I am involved in mankind, and therefore never send to know for whom the bell tolls; it tolls for thee." (XVII, Meditation, Devotions upon Emergent Occasions, 1624.) Present-day equivalent judicial language is to be found in Krause v. Peoria Housing Authority, 370 Ill. 356: "While only families of low income receive direct benefit from the projects [public housing], all persons in the community will benefit indirectly. It is common knowledge that slum areas create fire hazards, increase the danger of epidemics and promote crime and juvenile delinquency. By lessening these evils all persons in the community are benefited"; or in New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N.E.2d 153, as quoted in the Krause decision: " 'The public evils, social and economic, of such conditions are unquestioned and unquestionable. Slum areas are the breeding places of disease which take toll not only from denizens, but, by spread, from the inhabitants of the entire city and state. Juvenile delinquency, crime and immorality are there born, find protection, and flourish. Enormous economic loss results directly from the necessary expenditure of pub-

157

lic funds to maintain health and hospital services for afflicted slum dwellers and to war against crime and immorality. Indirectly there is an equally heavy capital loss and a diminishing return in taxes because of the areas blighted by the existence of the slums.' "

Defendant complains that he is one of the first "victims," as he views the situation, of the new type of inspection. But to adopt his interpretation of the ordinances, i.e., that the city cannot institute suit until after notice has been served, would, in effect, amount to an invitation to all property owners to flout the law until city inspectors can inspect the property, serve notice if violations are found, and refrain from filing suit until the owner has indicated that he will not make the necessary repairs. Such an administration of the housing ordinances would be—as we know all too well from experience—costly indeed, in terms of human life and in terms of expensive procedure for administration; until now, everyone who has not had a financial return from operating slum housing has been the victim in that he has indirectly contributed, because of the necessarily higher taxes, to the wealth of such operators. The person just over the wrong side of the dividing line—timewise or otherwise—always feels aggrieved; but the division must be made some time, somewhere. And certainly the long-range view looking to the social betterment of the many, rather than the short-range view looking to the illegal enrichment of the few, must prevail. Like counsel for the defendant we too subscribe to the view expressed in Offutt v. United States, 348 U. S. 11, that "justice must satisfy the appearance of justice," that Caesar's wife must not only be virtuous, but must appear to be virtuous. In the present case it seems to us that the cause of justice is best served by giving expression to the intent of the city council that the ordinances here under consideration be enforced with a view to the safety of the public, rather than as an invitation to

158

property owners to defer their application by legal maneuvers; the spirit of the law, as well as its outward form, should be observed.

We find no convincing reason for reversal, except for the excessive fines which were imposed for three of the violations. Accordingly, with this exception, the judgments of the Municipal Court are affirmed: as to those three fines, their total is reduced from $300 to $150. Judgments are affirmed in the total amount of $2,850.

Judgments affirmed as modified.

BURKE, P. J. and BRYANT, J., concur.