THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* RENAULT ROBINSON, Defendant-Appellant.

(No. 58942; 

First District (2nd Division)—September 9, 1975.

Gary M. Elden, of Chicago (Thomas A. Gottschalk, William J. Gibbons, and Kermit Coleman, of counsel), for appellant.

Richard L. Curry, Corporation Counsel, of Chicago (Daniel Pascale, Richard F. Friedman, and Terrance Hilliard, Assistant Corporation Counsel, of counsel), for appellee.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Defendant, Renault Robinson, and a companion, Nathan Silas, both Chicago policemen, were charged with disorderly conduct in violation of section 193—1(a) of the Chicago Municipal Code.[1] After a first trial ended in a hung jury, a second jury found defendant guilty and Silas not guilty. Defendant was fined $200 plus costs of $10. Defendant's post-trial motion for judgment notwithstanding the verdict on evidentiary, constitutional and abuse of process grounds was denied. This appeal is from that denial and from the judgment entered on the verdict.

---

[1] The applicable section reads as follows:

"193—1. A person commits disorderly conduct when he knowingly:

(a) Does any act in such unreasonable manner as to provoke, make or aid in making a breach of the peace; *  *  *
*   *   *

A person convicted of disorderly conduct shall be fined not less than $5.00 nor more than $500.00 for each offense."

On appeal, defendant contends:

(1) the city did not prove that defendant "knowingly" performed an act "in such an unreasonable manner as to provoke * * * a breach of the peace";

(2) that convicting him under this ordinance renders the ordinance void for vagueness and overbreadth as applied; and

(3) that the ordinance was applied in this case in such a discriminatory manner as to render defendant's conviction unconstitutional.

The form complaint, in pertinent part, charges:

> "*Dean Welshhons* complainant, now appears before the Circuit Court of Cook County and states that *Robison* [sic] *Renault* has, on or about *9 May 70* at *151 E. Monroe* Chicago, Cook County, Illinois Committed the offense of Disorderly Conduct in that he knowingly
>
> ☒ a) Did any act in such unreasonable manner as to provoke, make or aid in making a breach of peace." (Underscored matters filled in.)

### THE TRIAL EVIDENCE

The evidence established that, on the evening of May 9, 1970, the Young Artists Studio presented a mixed media satire at the smaller (hereinafter studio) of the two theatres at the Goodman Theatre (hereinafter Goodman) in downtown Chicago. The satire included film contributed by the defendant as a representative of the Afro-American Patrolman's League,[2] in return for which the management had provided defendant with four complimentary tickets. Defendant and his wife were planning to go to the satire with two friends. The friends having not shown up, defendant and his wife were driven to the Goodman by another friend, Nathan Silas, in whose car they arrived at the theatre parking lot shortly before 10 p.m. The car was parked in a place allowed by Dean Welshhons, the chief of security for the Goodman, who then gave defendant's party directions to the Goodman. Welshhons then called Russell Tutterow, the Goodman manager who was taking tickets at the door. A defense objection to inquiries concerning why Welshhons had called Tutterow was sustained. Welshhons testified he observed all three members of the party to be amiable and in good spirits.

By the time defendant, his wife and Silas arrived at the Goodman lobby, the performance in the studio—and in the larger theatre where

---

[2] The Afro-American Patrolman's League is an organization of black policemen in the City of Chicago. The organization was founded in May, 1968, by defendant who served as its first president.

a play was being presented (hereinafter theatre)—had long since commenced. Tutterow testified that, when he asked defendant for the party's tickets, defendant spoke with a "slurred" diction and appeared to have been drinking. Defendant, he further testified, in looking for the tickets in his pants pockets, had pulled back his suitcoat revealing a gun stuck in the waistband of his pants. Tutterow asked the party if they would wait ten minutes until intermission which they said they would do. Defendant testified that he, his wife and Silas did briefly enter the studio prior to intermission.

Tutterow called Welshhons. An objection to the content of that conversation was also sustained. Welshhons subsequently called the police and later proceeded to the Goodman. The police arrived, as did Welshhons, before intermission ended. During intermission 700 people from the theatre and 150 from the studio came into the lobby. After intermission defendant's party entered the studio to look for seats, having waited, defendant testified, until most of the people had returned to their seats. The party encountered difficulty in finding seats.

When the City of Chicago police arrived, Tutterow described the defendant to the police who then entered the studio where the party was looking for seats. The participating officers testified that an Officer Stanley, who claimed to know the defendant and who did not testify at trial, volunteered to speak to defendant to "see if he could talk him out of the [studio] theatre." After Stanley greeted the defendant and shook hands, an Officer Dillan, dressed in plainclothes, thought he observed defendant passing a gun to his wife and, therefore, without identifying himself, grabbed defendant's hand. In so doing Dillan fell against defendant's wife causing her to stumble and fall against an aisle seat. Dillan testified Mrs. Robinson did not fall. Defendant, aware that his wife had a year earlier fractured her hip—for which she was still receiving medical treatment—exclaimed, apparently to Silas, "Who was that white mother fucker in the blue sportscoat who pushed my wife?"

Defendant testified that after this incident, Stanley asked him to go into the lobby which he proceeded to do. Defendant and his wife both testified that in the lobby when Stanley told him of the "man-with-a-gun" complaint, defendant opened his coat to show that he had no gun. Sergeant Clancy, the arresting officer, testified that when he arrived at the Goodman, defendant was talking with Stanley in the lobby in the presence of several other officers. Clancy further testified that he went up and asked Robinson and Silas if they were police officers and, if so, to produce credentials. Robinson refused to respond to either of these requests, whereas Silas, though he did not produce credentials, did tell Clancy he was a police officer. Stanley informed Clancy that Robinson

was a police officer and head of the Afro-American Patrolman's League.

After intermission, assuming from the lack of available seats in the studio that they had been in the wrong theatre, the party proceeded into the theatre where a dramatic presentation was in progress. Tutterow followed defendant into the theatre and asked him to leave, to which request defendant did not respond. Tutterow then went out into the lobby where he asked the police to tell defendant to leave. Police officers then entered the theatre where Sergeant Clancy gave defendant three direct orders to leave. Defendant did not respond to any of these orders.

After a few minutes, defendant, his wife and Silas did go out into the lobby where defendant engaged in a conversation with the police officers. During the 20 minutes the conversation ensued, defendant remarked to Sergeant Clancy, "What do you need all these fucking pigs for just the two of us?" apparently referring to the ten to fifteen police officers assembled there. Defendant made this remark in a voice loud enough for more than one witness to testify to it.

William Reid, a security guard for the Goodman, testified that defendant had "on two occasions walked away [from the police officers] and pulled open the doors to the big theater, so that the noise went in and people came out asking what was wrong," that, in the process, defendant shouldered him aside, though Reid was dressed in a uniform, and that defendant told him to "[g]et out of the way." Welshhons, in his testimony, concurred that patrons came out of the theatre at this time and stood in the entrance of the theatre "watching the action." Welshhons additionally testified to hearing defendant, while talking with the officers, say "take your hands off me, you white mother fucker."

Sergeant Clancy informed the defendant of the nature of the complaint—that a man fitting his description had been observed carrying a gun. Witnesses for the City testified that defendant was not responsive after being so informed. Sergeant Clancy also informed defendant's party that the management would press charges if they refused to leave. Since they continued to persist in their refusal, Welshhons volunteered, on Clancy's request, to sign a complaint. Thereupon defendant and Silas were placed under arrest, and along with defendant's wife, were all searched. No guns were found on either of the Robinsons, but two guns were found on Silas.

### ALLEGATIONS MADE IN THE POST-TRIAL MOTION

In defendant's post-trial motion for judgment notwithstanding the verdict, he contended, for the first time, that the prosecution of the present case resulted from defendant's prior history of strained relations with the police department as president and founder of the Afro-American

Patrolman's League. Defendant also alleged that the prosecutor for the City had offered to drop the charge if defendant would voluntarily dismiss the civil rights suit he and the league then had pending against the City of Chicago, the Police Review Board of the City of Chicago and other named parties.[3] Additionally, defendant attacked the conviction both on constitutional and evidentiary grounds.

In aid of his first contention, defendant submitted affidavits and exhibits which had been entered in support of the Federal suit. These affidavits and exhibits detailed defendant's prior experiences with the Chicago Police Department suggesting that a large number of disciplinary actions had been taken against the defendant after his commencing involvement with the league, whereas no such actions had been taken prior to that time. In addition, defendant submitted six affidavits from Chicago police officers who alleged, based on their experience as police officers and on a summarized statement of facts, that no member of the department would have made an arrest under the circumstances stated in a statement of facts attached to the affidavits, and that they had never known of a disorderly conduct case of similar circumstances that was prosecuted to the degree that the present case was being prosecuted. The summarized statement of facts not agreed to by the City, presented a brief summary of the facts from the defendant's point of view, including the statement "[l]ater investigation showed that both guns [found on Silas] were registered in the name of the policeman who possessed them." In support of the second contention—that the City offered to drop the charge in exchange for defendant's dropping his and the league's Federal suit, defendant offered to present evidence at the post-trial motion hearing. The trial judge refused to accept this evidence, however, since he noted that the court had never previously been made aware of any such negotiations. In the briefs presented to this court, the parties elaborated on the supposed incident, with the City admitting that an "offer" was made and rejected. The City characterized its "offer to drop [a prosecution] already well under way" as an "attempt at compromise or settlement."

The record shows that the incident at the Goodman took place on May 9, 1970; and that the defendant filed his action in the Federal court on September 9, 1970, and the jury returned its guilty verdict on October 25, 1972.

The arguments defendant made as to the alleged constitutional and evidentiary deficiencies of the conviction were essentially the same as

---

[3] On September 9, 1970, defendant and the Afro-American Patrolman's League filed suit known as 70 C 2220 in the United States District Court for the Northern District of Illinois, Eastern Division.

those presented to this court in this appeal. The trial court denied the post-trial motion observing that there was ample evidence for the jury to convict, that the defendant was well aware of the charge and the facts under which he was charged and thus the ordinance was not void for vagueness, and that the ordinance as set forth and as applied was constitutional.

## I.

■■ We first consider whether the City failed to prove by a clear preponderance of the evidence that defendant "knowingly" committed an "unreasonable" act to make or provoke a breach of the peace as charged. Clear preponderance of the evidence is the burden by which the City must prove its case in quasi-criminal cases such as the present one. (*Ruth v. City of Abingdon* (1875), 80 Ill. 418; *City of Chicago v. Williams* (1st Dist. 1963), 45 Ill.App.2d 327, 329, 195 N.E.2d 425.) In our opinion there is ample evidence in the record to support the jury's verdict.

Defendant was charged with the violation of section 193—1(a) of the Chicago Municipal Code. In *City of Chicago v. Morris* (1970), 47 Ill.2d 226, 231, 264 N.E.2d 1, the same city ordinance was considered by our supreme court which held that "whether a violation has occurred is determined by the reasonableness of the conduct in relation to the surrounding circumstances." See also *City of Chicago v. Otten* (1st Dist. 1971), 133 Ill.App.2d 57, 60, 272 N.E.2d 844; and *United States v. Woodard* (7th Cir. 1967), 376 F.2d 136, 141.

The police had been called to the Goodman on the basis of Tutterow's belief that defendant was carrying a gun. Approximately 850 people were in the two theatres within the building. When the police informed the defendant of the nature of the complaint and that it related to a man fitting his description, defendant, according to the testimony of plaintiff's witnesses, refused to respond. Although Officer Stanley knew defendant's identity, the defendant avoided giving the police officers conducting a proper investigation the benefit of the knowledge that he was himself a police officer. There is evidence in the record from which the jury could conclude that defendant's actions caused an actual disruption of a play in progress both within the theatre and in the lobby adjoining the theatre. The evidence that the defendant refused to leave the building upon management request and police order, after being informed by the police of the man-with-a-gun complaint, the use of loud and profane language and, on two occasions, opening the doors allowing the noise of the dispute to enter, was strong evidence for the jury in arriving at its verdict.

While it is true defendant's evidence disputed the testimony that de-

fendant possessed a gun and used profane language or a loud voice, the resolution of these conflicts was a matter for the jury. It has long been established that the credibility of witnesses and the weight to be accorded their testimony is in the province of the trier of fact. The jury was properly instructed both as to the essential elements necessary to be present before a person could be found guilty in a disorderly conduct prosecution, and that before the defendant could be found guilty, the jury must be convinced by a clear preponderance of the evidence.

■■ Here there was adequate evidence upon which the jury could conclude that under the surrounding circumstances—a theatre with some 850 persons present, a complaint concerning a man-with-a-gun in the building, an attempt on the part of the police to investigate the complaint—the conduct of the defendant was a knowing and an unreasonable cause of a disturbance and tended to provoke a breach of peace. We find there is a clear preponderance of the evidence to support the jury verdict.

Defendant cites numerous cases wherein the courts have held that mere refusal to obey a police command, when there is no evidence of a disturbance, and that the use of abusive or profane language or mere loudness of defendant's voice, could not justify arrests for disorderly conduct and breach of peace. We have reviewed each of the cited cases, and in our opinion the factual situations are sufficiently different from the facts in this case so as to distinguish each of them. As our supreme court said in *Morris*, "disorderly conduct has never had a precise meaning in relation to specific conduct." 47 Ill.2d 226, 231.

## II.

Defendant next contends that the ordinance is void for vagueness as applied to him. It suffices to note that section 193—1(a) has withstood similar attacks to its constitutionality, with an everpresent emphasis on or reference to cases emphasizing the "knowingly" and "unreasonable" requirements of the ordinance.

In *City of Chicago v. Morris*, 47 Ill.2d 226, 230-31, our supreme court upheld section 193—1(a) against a claim of a violation of the first amendment. See also *City of Chicago v. Otten*, 133 Ill.App.2d 57, 58-60; *United States v. Woodard* (7th Cir. 1967), 376 F.2d 136, 140-42; and *People v. Raby* (1968), 40 Ill.2d 392, 395-98, 240 N.E.2d 595, *cert. denied* (1969), 393 U.S. 1083, upholding the constitutionality of the Illinois disorderly conduct statute (Ill. Rev. Stat. 1965, ch. 38, par. 26—1(a)[4], virtually iden-

---

[4] Section 26—1(a) provided in 1965 and still provides:
"(a) A person commits disorderly conduct when he knowingly:
(1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace; * * *"

tical to the section of the ordinance in question.

Defendant strongly urges that defendant had a constitutional right to question and protest his detention, questioning by police and arrest. Defendant states "* * * the City wants to punish Robinson for exercising the same rights exercised by the defendant in *Norwell v. City of Cincinnati*, 414 U.S. 14 (1973)." Norwell was convicted of a violation of Cincinnati's disorderly conduct ordinance in that he "'did unlawfully and wilfully conduct himself in a disorderly manner, with intent to annoy some person.'" Norwell, a 69-year-old immigrant, was walking on the street at night, was stopped and questioned as to the reason for his presence. He protested verbally, threw off the officer's arm and continued to walk away. He was arrested for "being loud and boisterous" and for "annoying" the officer. In a per curiam opinion, the Supreme Court held that the application of the ordinance to Norwell violated his constitutionally protected right of speech, since he had been arrested and convicted merely because he verbally and negatively protested the officer's treatment of him. It is to be noted there was no abusive language or fighting words involved, nor was he arrested or convicted for the physical act of pushing the officer's arm. As the Supreme Court said, "Regardless of what the motivation * * *, it is clear that there was no abusive language or fighting words. If there had been, we would have a different case. See *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)." 414 U.S. 14, 16.

■■ Defendant also cites *Cohen v. California*, 403 U.S. 15, 29 L.Ed.2d 284, 91 S.Ct. 1780, *rehearing denied*, 404 U.S. 876 (1971), as authority that vulgar expressions are protected under the first amendment and that defendant's vulgar expressions must likewise be so protected. Cohen was convicted for disturbing the peace by wearing a jacket, in the corridor of a county court house, bearing the words "Fuck the Draft." The Supreme Court, in reversing the conviction, held the California Penal Code which prohibited "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person * * * by * * * offensive conduct," is not violated by a simple public display of this single four-letter expletive. (403 U.S. 15, 26.) In our opinion neither *Norwell* or *Cohen* are applicable to the conduct of the defendant in this case when viewed in light of the surrounding circumstances, all of which bring his conduct within the provision of section 193—1(a). We hold there to be no merit to the contention that the ordinance is void for vagueness as applied to the defendant.

## III.

Defendant's final contention is that the City's disorderly conduct ordi-

nance was administered as to the defendant in such a discriminatory manner as to render his conviction unconstitutional. Simply stated, defendant claims the City had ulterior motives in prosecuting this case.

This theory was first raised as part of a post-trial motion filed in the trial court on February 26, 1973, approximately four months after the jury returned the guilty verdict. To support this contention defendant filed on February 26, 1973—the date the matter was before the trial judge —affidavits, dated February 26, 1973, from six persons identified as Chicago police officers, attesting that, in consideration of the circumstances as summarized in a statement of facts upon which the affidavits are based, no officer would have made an arrest and no person, within their knowledge, had been similarly prosecuted. As stated earlier, the statement of facts contained some facts not before the jury or based in part solely on defendant's theory of the evidence.

Defendant first asserts that he was prosecuted solely because of his position with the Afro-American Patrolman's League for activities for which most persons would not have been prosecuted. Defendant did not raise this contention at any time before or during the two jury trials. Defendant also presented, as evidence in support of his motion that the prosecution was discriminatory as to him, affidavits and exhibits tending to show that a great deal of disciplinary action was taken against him only after he had begun his association with the league. It is to be noted that all of the dates referred to in defendant's allegations preceded the start of the second trial.

Defendant argues that the presentation of this evidence made out a prima facie case of discriminatory prosecution sufficient to shift the burden of persuasion to the City. In support of this contention, he cites, in his initial brief, *City of New Orleans v. Levy* (1957), 233 La. 844, 98 So.2d 210, and *Yick Wo v. Hopkins* (1886), 118 U.S. 356, 373, 30 L.Ed. 220, 6 S.Ct. 1064, and, in his reply brief, *United States v. Crowthers* (4th Cir. 1972), 456 F.2d 1074, *United States v. Falk* (7th Cir. 1973), 479 F.2d 616, and *United States v. Steele* (9th Cir. 1972), 461 F.2d 1148. In each of these cases—with the exception of *Yick Wo* which involved an ordinance found to be discriminatory as applied by the licensing board —the respective courts did find the defendant to have made out a prima facie case of discriminatory prosecution and reversed on the basis of the prosecution's failure to prove the prosecution was not discriminatory. (233 La. 843, 852-53; 456 F.2d 1074, 1078; 479 F.2d 616, 623; 461 F.2d 1148, 1152.) In each of these cases, however, the evidence upon which the reversal was based was presented at or prior to the trial, and discriminatory prosecution was, indeed, the sole or main contention of the

defendant at trial. (233 La. 843, 850-52; 118 U.S. 356, 358-59, 361; 456 F.2d 1074, 1078-79; 479 F.2d 616, 619; 461 F.2d 1148, 1152.) No case has been presented to this court wh'ch suggests that a prima facie case of discriminatory prosecution can, where defendant is aware of the basis for the claim during the trial, be presented for the first time in a post-trial motion. Such a procedure—limiting as it does the opportunity to search out the truth through witnesses, presentation of evidence and full disposition by the trial court—could only be justified if the post-trial motion was the first practical opportunity the defendant had to raise the issue after becoming aware of the basis for it. See *Missouri ex rel. Missouri Insurance Co. v. Gehner* (1930), 281 U.S. 313, 320, 74 L.Ed. 870, 50 S.Ct. 326; *Brinkerhoff-Faris Trust & Savings Co. v. Hill* (1930), 281 U.S. 673, 677-78, 74 L.Ed. 1107, 50 S.Ct. 451.

■■ Defendant asserts that the post-trial motion was the first opportunity to raise the issue after becoming aware of the "full basis" for the claim. We disagree. If the prosecution was discriminatory, defendant would or should have been aware of that motivation at or before the commencement of the first trial. Defendant was, at that time, completely cognizant of the alleged harassment to which he asserts he was being subjected by the Chicago Police Department. This awareness is evidenced by the dates on the affidavits and exhibits submitted in support of that contention and the filing, by defendant, of a Federal suit to that effect only four months after the incident. Clearly, nothing further could have constituted the demarking line of the defendant between a discriminatory and nondiscriminatory prosecution. The defendant proceeded through the second trial and his conviction before characterizing the prosecution to the court as discriminatory. We, thus, find that defendant not only did not take the first practical opportunity but actually allowed many opportunities, wholly proper to the disposition of such an issue, to pass by. The procedures used by the defendant in *United States v. Falk*, including pretrial motions and offers of proof, are examples of steps defendant could have taken both to present the contention to the trial court and preserve the issue for review. We find that defendant in the present case did not so preserve the issue.

■■ In connection with post-trial motions for a new trial based on newly discovered evidence, our supreme court, in *People v. Baker* (1959), 16 Ill.2d 364, 374, 158 N.E.2d 1, stated:

> "[T]he new evidence must be of such conclusive character that it will probably change the result on retrial, * * * it must be material to the issue but not merely cumulative, and * * * it must have been discovered since the trial and be of such character

that it could not have been discovered prior to trial by the exercise of due diligence. (*People v. Holtzman,* 1 Ill.2d 562; *People v. Harrison,* 359 Ill. 295.)"

(See also *People v. Brown* (4th Dist. 1970), 125 Ill.App.2d 336, 341-42, 261 N.E.2d 11.) It is obvious that the defendant failed to establish the requirements necessary for the trial judge to order a new trial on newly discovered evidence.

Even had defendant properly presented the issue, we would still find defendant's claim to be without merit. The affidavits of the police officers which defendant submitted in support of his contention are fatally tainted by the self-serving summarized statement of facts which includes the allegation that "[l]ater investigation showed that both guns [found on Silas] were registered in the name of the policeman who possessed them." No evidence having been presented in this regard for the consideration of the second jury, that jury was quite justified in believing that defendant had passed off the gun Tutterow had observed, to Silas. Since the affiants were not presented with an accurate statement of facts reflecting the material facts before the jury, their affidavits are fatally tainted and could not tend to prove a prima facie case. More importantly, we find sufficient evidence on the record to support this conviction and can adduce no evidence from the record that *this* prosecution—however much other aspects of defendant's professional life may have been affected—was generated by "an evil eye and an unequal hand" as condemned in *Yick Wo.* 118 U.S. 356, 373-74.

■■ The second part of defendant's final contention rests on an alleged offer extended by the prosecution to drop the present suit in exchange for defendant and the league dropping a pending Federal suit. The fact is the Federal suit was not dropped and the instant case is based on the conduct of the defendant on May 9, 1970, which conduct the jury found violated the City disorderly conduct ordinance. We find here that defendant not only failed to make out a case of such abuse of process before the trial court, but also that defendant seems not to have taken the claim seriously himself. Once again, though the alleged offer to drop the prosecution allegedly occurred sometime between the first and second trials, defendant never mentioned this claim during the course of the trial. In his post-trial motion, as above, defendant raised the issue and attempted to introduce evidence of the abuse. The court, however, remarking that it had never heard of this alleged abuse prior to the motion, then denied the motion. Though the defendant did renew his allegation in his brief, he failed to assert before this court any evidence in support of this theory. The City, in its brief before this court, did make reference to an offer to drop prosecution, but no admission was made sufficient to

relieve defendant of his burden to show abuse of process. In light of all of the above, we find defendant did not make out a claim of abuse of process or properly present it.

We find sufficient evidence which the jury as trier of fact could have believed to be true to support their verdict against the defendant. We further find no constitutional violations either in the ordinance itself or in the method of enforcement utilized. We further find the defendant failed to present properly or make out any case of ulterior motive on the part of the City in this prosecution. As a result of these findings, we affirm the conviction below.

Judgment affirmed.

STAMOS and LEIGHTON, JJ., concur.