THE CITY OF CHICAGO, Plaintiff-Appellant, v. RN REALTY, L.P., *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—03—2214

Opinion filed April 21, 2005.

338

QUINN, J., dissenting.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and David Graver, Assistant Corporation Counsel, of counsel), for appellant.

Elizabeth D. Sharp, of Chicago, for appellees.

JUSTICE GREIMAN delivered the opinion of the court:
Plaintiff City of Chicago (City) filed suit against defendants RN

Realty, L.P. (RN), and Plymouth Building, L.P. (Plymouth), alleging violations of the Chicago Building Code for failure to maintain several structures appurtenant to the building located at 417 South Dearborn Street (Building). Following a trial, the circuit court entered judgment in favor of defendants. The City now appeals, and for the reasons that follow, we affirm.

The City filed its initial complaint on October 17, 2000, alleging that defendants owned and maintained the building and that, on July 11, 2000, and thereafter, a parapet on top of the building was out of plumb, an exterior wall had visibly open joints, and defendants had failed to file a timely structural engineering report in violation of sections 13—196—010, 13—196—530, and 13—196—030 of the Chicago Building Code (the Code) (Chicago Municipal Code §§ 13—196—010, 13—196—530, 13—196—030 (2004, 1990, 2004, respectively)). The City sought fines for each day the violations existed and equitable relief compelling defendants to bring the Building into compliance. In their answer, defendants acknowledged that they owned and managed the Building, but denied any Code violations. Defendants also alleged the affirmative defenses that the City failed to state a cause of action upon which relief could be granted; that they had filed a structural engineering report in May 2000 and another was not due until September 26, 2002; that the parapet had been braced on October 30, 2000, and was no longer in need of repair; and that the cracks in the exterior wall had been repaired on February 23, 2001.

In response, the City filed a motion pursuant to section 2—615(a) of the Code of Civil Procedure (735 ILCS 5/2—615(a) (West 2000)) to dismiss defendants' affirmative defenses, arguing defendants' assertions as to the repairs performed were improper and unsupported and that substantial compliance was not a viable defense and amounted to an admission of the alleged violations. The circuit court granted the City's motion as well as leave to file an amended complaint alleging further violations discovered during a more recent critical examination by its inspector.

In its amended complaint, the City alleged that: (1) since July 11, 2000, and thereafter, defendants had violated section 13—196—037 of the Code by failing to maintain and repair the parapet and exterior wall (Chicago Municipal Code § 13—196—037 (2003)) (count I); (2) since an October 22, 2001, inspection and thereafter, defendants violated sections 13—196—037, 13—196—641, 13—196—530(b), and 13—196—530(e) by failing to maintain and repair the out-of-plumb parapet, failing to repair rusted and broken metal flashing, failing to repair open mortar joints between brick and clay wall tiles, failing to repair a deteriorated water table, and failing to repair rusted metal

cladding (Chicago Municipal Code §§ 13—196—037, 13—196—641, 13—196—530(b), (e) (2003, 1990, and 1990, respectively)) (count II); (3) since the October 22 inspection, defendants violated sections 13—196—550(a), 13—160—070, and 13—196—080 by failing to replace broken window panes on the first floor, failing to remove a canopy that obstructed the full extension of a fire escape, and failing to repair a window located next to the fire escape (Chicago Municipal Code §§ 13—196—550(a), 13—160—070, 13—196—080 (1990, 1998, and 1998, respectively)) (count III); (4) since October 22, 2001, defendants violated section 18—27—700.6 of the Chicago Electrical Code by failing to restore exit and emergency lighting systems to working condition (Chicago Municipal Code § 18—27—700.6 (1999)) (count IV); (5) defendants' alleged violations of the Building Code constituted a public nuisance and presented an imminent risk of injury to the public, in violation of section 7—28—060 of the Municipal Code (Chicago Municipal Code § 7—28—060 (2003)) (count V); and (6) the danger presented to the public through defendants' violations of the Building Code could not be adequately remedied at law and required immediate injunctive relief (count VI). The City alleged that each defect constituted a dangerous and hazardous condition and in relief sought injunctions compelling defendants to remedy the violations and fines for each day that each violation occurred.

Defendants answered by denying or alleging that they had insufficient knowledge of whether they had violated any Building Code provisions. Defendants also raised several affirmative defenses, alleging that: (1) they had engaged a structural engineer who prepared a critical examination report concerning the Building and found no dangerous or hazardous conditions; (2) they had remedied the alleged violations; (3) the City's complaint cited nonexistent Code provisions or ones that were inapplicable to the Building and thus failed to state a cause of action; and (4) they had installed a canopy on the Building's west side to protect the public while repairs were undertaken.

At the start of trial, the City's counsel conceded that defendants had complied with all Building Code provisions but stated that he was "not in a position" to dismiss the complaint. However, the City did move to dismiss count I of its amended complaint, and the trial court granted the motion. Counts V and VI had also been voluntarily dismissed prior to trial, and the City proceeded only on counts II, III, and IV, seeking fines for each day each condition did not comply with Building Code provisions. Defense counsel remarked in her opening that the purpose of proceedings in housing court is normally to effect compliance with the Building Code rather than fix fines for remedied violations, and because defendants had complied by remedying the violations alleged, fines should not be awarded.

City building inspector Julio Montilla testified that he had inspected the Building on October 22, 2001, and that on that date he observed the south finial on the Building's west elevation leaning toward the public way below. He also observed several rusted and broken pieces of metal flashing and open mortar joints on the building's exterior, which would allow water to penetrate into the Building. Montilla further observed a rusted metal water table, rusted and peeling decorative metal cladding on the Building's front face, and a broken window on the first floor, just above the sidewalk. He also noticed problems with one of the Building's fire escapes, specifically, that a window accessing the fire escape would not open due to a broken sash cord, and the fire escape would not lower to street level because it was obstructed by a canopy attached to a neighboring structure. Finally, Montilla observed that the emergency power supply to the emergency lighting did not function.

On cross-examination, the City's attorney stipulated that Montilla conducted a subsequent inspection of the Building in January 2002 and that he would testify that all violations alleged in the complaint had been brought into compliance. The City also presented photographs of the conditions to which Montilla had testified.

Defendants called Marilyn Fornell, who had served as RN's senior property manager since June 2001. Fornell testified that she was apprised of the City's complaint by the outgoing manager and in response formulated a plan to address the alleged violations and began soliciting bids from contractors to undertake the recommended repairs. She engaged structural engineers to survey and rebuild the decrepit finial and rusted metal flashing. RN entered into a contract with the engineers to undertake the repairs in September 2001. RN engaged a contractor to remove loose paint and repaint any peeling areas on the Building's exterior, and work was completed in January 2002. RN engaged another contractor to repair the rusted water table and other structures, and repairs were pending at the time of trial. Another contractor was engaged to replace the broken windows with plywood, and work was completed in December 2001. That same month, Fornell contacted the manager of the adjoining building, where the attached canopy prevented the Building's fire escape from extending fully, and facilitated in removing a portion of the canopy so that the fire escape was no longer obstructed. Also in December 2001, another contractor replaced the fourth-floor window adjacent to the fire escape, and the window was fully functional at the time of trial. Fornell engaged an electrician who replaced the battery packs powering the emergency lighting, and work was completed in November 2001.

Defendants also submitted a report by structural engineer Peter

Kralitsch, who had sealed cracks in the Building's facade on October 30, 2000, and had found the exterior to be in "good condition" on March 26, 2001. Structural engineers from the firm of Kellermeyer, Godfryt, Hart issued a report concerning a critical examination they had conducted in May 2001, and they observed "[n]o unsafe or imminently hazardous conditions" during their examination. The engineers also noted that the mortar joints on the Building's exterior "were observed to have been coated with *** roofing cement" and the openings were "sealed to minimize the potential water penetration." A subsequent letter from Kellermeyer, Godfryt, Hart, dated January 9, 2002, opined that no "dangerous and/or imminently hazardous conditions" existed within the Building's west elevation as of that date.

After trial, the City voluntarily dismissed count IV and sought relief only on counts II and III in its posttrial brief. The City asserted that Fornell's testimony should be given little weight due to her lack of personal knowledge as to the completion of the repairs she alleged and that there was no dispute that defendants had been in violation of the Building Code provisions it outlined in counts II and III of the complaint. The City asked the court to find that: (1) the finial was out of plumb on October 22, 2001, and was brought into compliance on January 9, 2002; (2) the metal flashing, open mortar joints, and peeling paint were in violation on October 22, 2001, and were brought into compliance on January 9, 2002; (3) the water table was rusted and disintegrating on October 22, 2001, and was brought into compliance on January 9, 2002; (4) the metal cladding was rusted and showed peeling paint on October 22, 2001, and was brought into compliance on January 9, 2002; (5) the first-floor window panes were cracked on October 22, 2001, and were brought into compliance on January 5, 2002; (6) the canopy of the adjoining building obstructed the Building's fire escape on October 22, 2001, and was brought into compliance on December 28, 2001; and (7) the window adjoining the fire escape failed to open on October 22, 2001, and was brought into compliance on April 19, 2002. The City sought fines for each day each feature was not in compliance and requested judgment in the amount of $321,500.

In their brief, defendants observed that all of the conditions for which the City sought fines had been brought into compliance within two months of the filing of the amended complaint. Defendants argued that the City did not carry its burden of proof in showing that defendants had violated Building Code provisions and that, even if violations had been proven, Illinois law held that cooperation and compliance by defendants should militate against the assessment of fines. Defendants further argued that, if fines were assessed, they should be the minimum amount and not imposed on a daily basis, and

that the Building Code required notice of violations to building owners before fines could be imposed.

At the hearing on the parties' posttrial motions, the trial court found that the City's multiple allegations of violations of the same Building Code sections did not constitute separate and distinct violations. The court also noted that the purpose of the Building Code was to protect the public from unsafe conditions and that courts should adopt the least restrictive means to ensure compliance. The court reasoned that, because compliance had been achieved, imposing the amount of fines the City sought would not serve the purpose of enforcement and would instead be punitive in nature because defendants had shown good faith, cooperation, and diligence in responding promptly to the City's allegations. The court determined that defendants' compliance constituted a defense to the City's allegations and entered judgment in their favor.

The City filed a motion to clarify and reconsider, contending that the court's findings were against the manifest weight of the evidence and its conclusions of law were erroneous. The City argued that the violations alleged were not contested and that compliance was not a defense to liability, and it sought clarification of the judge's rulings that the purpose of the Building Code was compliance and that courts were to adopt the least restrictive means in enforcing the Code. Defendants responded that the City brought forth no new evidence or legal authority and that defendants should not be fined for each day of each violation because they did not received notice of counts II and III of the complaint until the complaint was filed on November 8, 2001. Defendants also argued that their compliance negated the purpose of imposing any fines and that the City did not sustain its burden of proof at trial.

The trial court granted the City's motion and struck the previous rulings and findings of fact. Again, the court found that several violations of the same Building Code provision did not constitute separate and distinct violations, that defendants fully complied with the violations alleged, that defendants did not receive proper notice of the violations alleged in counts II and III of the City's complaint, and that the City had failed to sustain its burden of proof at trial as it did not show that any dangerous and hazardous conditions existed at the Building. The court entered judgment in defendants' favor on all counts. The City now appeals.

On appeal, the City contends that the trial court erroneously entered judgment in defendants' favor on the basis of nonexistent defenses, arguing that the City was not required to prove that any of the alleged Building Code violations were dangerous or hazardous,

that actual notice was not required before the City could prosecute the violations it alleged, that each violation alleged constituted a separate violation for each day that it was purported to occur, and that defendants' eventual compliance was not a defense to the violations. The City also contends that it is entitled to no less than $128,600 in fines because the trial court was obligated to impose a minimum daily fine of $200 for each of the seven violations alleged and the court's finding of full compliance was against the manifest weight of the evidence.

Because the arguments the City presents on appeal pertain to the trial court's conclusions of law as to available defenses and interpretation of the Building Code, and because the facts of the case are largely undisputed, our review is *de novo*. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). A reviewing court may sustain a trial court's decision on any basis appearing in the record. *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 359-60 (1999).

We initially consider the City's contention that it was not required to prove that the defects it alleged were dangerous or hazardous.

In count II of its complaint, the City alleged that, on the day of Montilla's inspection and thereafter, several unsafe conditions, namely the out-of-plumb parapet, rusted flashing, open mortar joints, rusted water table, and rusted cladding, existed at the Building, in violation of sections 13—196—037, 13—196—530(b), and 13—196—530(e) of the Building Code. Chicago Municipal Code §§ 13—196—037, 13—196—530(b), (e) (2003, 1990, and 1990, respectively).

Section 13—196—037 provides, in relevant part:

"(a) Every exterior wall and enclosure and parts thereof found to be in an unsafe condition shall be subject to notice by the commissioner of buildings to the owner/agent to take appropriate precautionary measures and effect such repairs or reinforcements in a timely manner as will bring the building exterior walls and enclosures and parts thereof into a safe condition." Chicago Municipal Code § 13—196—037 (2003).

Sections 13—196—530(b) and (e) provide, in relevant part:

"(b) Every exterior wall shall be free of holes, breaks, loose, or rotting boards or timbers, and any other conditions which might admit rain or dampness into the interior portions of the walls or to the exterior spaces of the dwelling.

\* \* \*

(e) All cornices, rustications, quoins, moldings, belt courses, lintels, sills, oriel windows, pediments, and similar projections shall be kept in good repair and free from cracks and defects which make them hazardous and dangerous." Chicago Municipal Code §§13—196—530(b), (e) (1990).

At trial, the City presented Montilla's testimony as to the conditions alleged in the complaint as well as photographs depicting their existence at the time of Montilla's inspection. With respect to sections 13—196—037 and 13—196—530(e), the City offered no opinion or anecdotal testimony or documentary evidence that the alleged defects in the exterior walls and projections constituted unsafe or hazardous conditions. Defendants presented Fornell's testimony as to her efforts to remedy the conditions cited by the City as well as reports by structural engineers who opined that the Building's exterior was in "good condition" and not unsafe, dangerous, or hazardous.

Section 13—196—037 clearly states that exterior walls found to be in unsafe condition are subject to citation and notice to a building owner to make repairs that would restore walls to a safe condition. Chicago Municipal Code § 13—196—037 (2003). Section 13—196—530(e) states that exterior projections must be kept free from defects that would make them hazardous and dangerous. Chicago Municipal Code § 13—196—530(e) (1990). While this court has not been able to find any case law stating specifically what the City is required to prove to show a violation of these provisions, in quasi-criminal proceedings such as the one below, the City must prove by a clear preponderance of the evidence that a building owner violated the relevant ordinance. *Village of Bridgeview v. Slominski*, 74 Ill. App. 3d 1, 6 (1979); *City of Chicago v. Robinson*, 32 Ill. App. 3d 149, 155 (1975).

While the City's evidence certainly showed by a clear preponderance of the evidence that the alleged defects existed and may have been aesthetically unpleasing, its evidence never even hinted that those conditions were unsafe or dangerous and thus actionable under sections 13—196—037 and 13—196—530(e). Defendants presented their own affirmative evidence to the contrary that the Building's exterior showed no unsafe, dangerous, or hazardous conditions through the reports issued by structural engineers. Each party presented evidence from witnesses with expertise in building maintenance and repair, and only defendants' evidence presented any opinions as to whether the conditions of the Building's exterior were unsafe or hazardous. The trial court was not required to afford the City's evidence any more weight than it did that of defendants. Furthermore, as soon as the defects were brought to defendants' attention via the City's amended complaint, defendants set about repairing each and every one. Thus, even had they been liable under these sections of the Building Code, defendants complied with section 13—196—037 by taking measures to "effect such repairs or enforcements in a timely manner" and brought "the building exterior walls and enclosures and parts thereof into a safe condition." Chicago Municipal

Code § 13—196—037 (2003). Accordingly, we conclude that the trial court's finding as to the violation of these provisions of the Building Code was not erroneous.

As to the violation of section 13—196—530(b) alleged in count II, the City presented Montilla's testimony that in October 2001, he observed open joints between clay tiles on the Building's exterior and that open joints allow water to penetrate into buildings. Defendants presented the report by Kralick that purported that all exterior cracks had been sealed as well as the report by Kellermeyer, Godfryt, Hart that its engineers had performed a critical examination of the Building's exterior in May 2001, observed that the joints were coated with roofing cement, and sealed any openings to minimize water penetration.

The trial court received conflicting evidence as to whether there were openings in the Building's exterior that would admit water and thus would violate section 13—196—530(b). The court hearing this case was based in the municipal department and as such has exclusive jurisdiction over matters of Building Code enforcement and regularly deals with cases and evidence of this type. Cir. Ct. Cook County Gen. Order No. 2.3(b)(12) (eff. July 12, 2000); *Foster & Kleiser v. Village of Schaumburg*, 126 Ill. App. 3d 836, 839 (1984). Our perception of the evidence is not superior to the trial court's opportunity to observe and evaluate it and consider the relative merits of each party's case. See *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 181 (2002). Again, the court was not required to give any more deference to the City's evidence than to the defendants'. Accordingly, we determine that the court's finding as to the sufficiency of the evidence to sustain count II was not against the manifest weight of the evidence.

■ In count III, the City alleged that, on the day of Montilla's inspection and thereafter, the condition of the Building violated sections 13—196—550(a) and 13—196—550(c) of the Building Code in that there was a broken window on the first floor above a public way as well as a fourth-floor window adjoining the fire escape that had a broken sash cord and was difficult to open, and sections 13—160—070 and 13—196—080 in that the fire escape was obstructed by a canopy over the sidewalk below. Chicago Municipal Code §§ 13—196—550, 13—196—070, 13—196—080 (1990, 1998, and 2004, respectively).

Sections 13—196—550(a) and (c) state, in relevant part:

"(a) Every window shall be fully supplied with windowpanes, which are without open cracks or holes.

\*\*\*

(c) Every window \*\*\* shall be capable of being easily opened and shall be held in position by window hardware." Chicago Municipal Code §§ 13—196—550(a), (c) (1990).

At trial, Montilla testified that there were cracks in the rear first-floor window and identified photographs to that effect. However, there was no testimony or documentary evidence that the cracks were in fact open ones, as explicitly stated in section 13—196—550(a). Moreover, defendants produced evidence that the cracked window was located above a rear walkway but was shielded by a canopy above the sidewalk. Accordingly, we cannot find that the trial court's determination that the City failed to sustain its burden as to this allegation was erroneous.

■ As to the allegation of a violation of section 13—196—550(c), Montilla testified that "there was a window that would not open *** where the fire escape is at, due to a sash cord that was broken at the time." When asked whether he had attempted to open that window, Montilla replied, "It is a tall window and it is hard to open when that is not there." Montilla only testified in generalities and never stated whether he himself had attempted to open that particular window or whether he himself had difficulty opening it. Moreover, "capable of being easily opened" is a fairly subjective standard, and the trial court had no definitive evidence that the window was not in such a state. Therefore, we find that the trial court's ruling as to defendants' liability under section 13—196—550(c) was not erroneous.

■ Lastly, the City alleged that defendants had violated sections 13—160—070 and section 13—160—080 of the Building Code by allowing a sidewalk canopy to curtail the full extension of the Building's fire escape. Section 13—160—070 states: "There shall be no obstruction in any exitway that may hamper travel and evacuation." Chicago Municipal Code § 13—160—070 (1998). Section 13—160—080 states: "Every hallway, *** fire escape door, and other means of egress shall be kept clear and unencumbered at all times ***." Chicago Municipal Code § 13—160—080 (1998).

At trial, Montilla testified that the fire escape would not lower to street level because there was a canopy underneath it and identified a photograph depicting that situation. Again, Montilla never testified that he attempted to use the fire escape or that he had seen another person attempt to use it unsuccessfully. Fornell testified that the canopy had been erected by the owners of the neighboring building, not by defendants, and that the other owners promptly removed the canopy so that it would no longer obstruct the fire escape. While it may have been visually apparent that the fire escape was encumbered and would likely hinder evacuation, the cause of the condition was not attributable to defendants, who took prompt measures to alleviate the problem. Accordingly, we conclude that the trial court's finding of non-liability under these provisions was not erroneous.

■ In its argument on appeal, the City invokes its power as a home rule unit to enact regulations to protect the public's health and welfare and contends that the trial court's ruling "cripples" its ability to enforce the Building Code and to protect the public from decaying buildings through collecting fines from owners found to be in violation. Considering that the City never presented any evidence that the defects it alleged were a danger to public safety and the fact that defendants promptly repaired said defects, we fail to discern how the Code was not enforced in this instance and would not be enforced in the future. Indeed, even if we were to presume that defendants were guilty of violating the cited Code provisions, they undertook immediate and diligent efforts to cure all the defects prior to trial and the Code was thus enforced. "Where cooperation is shown, compliance has come about and imposition of a fine would not aid enforcement, a fine is improper." *Village of Glenview v. Ramaker*, 282 Ill. App. 3d 368, 372 (1996). Considering the relative strength of the City's case in conjunction with defendants' evidence of remediation efforts both before and after the filing date of the City's complaint, we believe that the imposition of fines would not have aided enforcement in this instance, and we find that the trial court's judgment in favor of defendants was not against the manifest weight of the evidence.

In its argument that daily fines were warranted in this instance, the City cites to our recent holding in *City of Chicago v. Alessia*, 348 Ill. App. 3d 218 (2004), where we held that the building permit section of the Municipal Code (Chicago Municipal Code § 13—12—050 (2003)) mandated fines against a defendant who had exceeded the specifications of three building permits. We find the facts of that case and the one before us distinguishable. In *Alessia*, the defendant stipulated to violating the permits and only made attempts at remediation well after the construction that violated the permits was completed and well after the City initiated litigation. *Alessia*, 348 Ill. App. 3d at 220-22. Here, defendants denied the violations alleged by the City, made immediate efforts to repair any and all defects, and presented sufficient evidence for the trial court to find in their favor. We therefore conclude that the authority cited by the City is not analogous to the facts of the case at bar.

The City also contends on appeal that the trial court's judgment was erroneous in that it was entered based on a nonexistent defense, specifically that actual notice to defendants was required before the City could prosecute the Building Code violations it alleged and seek fines as relief.

The City's amended complaint stated that it was brought pursuant to section 13—12—070 of the Building Code, which provides in relevant part:

"If the appropriate official *** shall determine, upon due investigation, that any building or structure in the city fails to conform to the minimum standards of health and safety as set forth in the said provisions of this code, and the owner or owners of such building or structure shall fail, after due notice, to cause such property to conform with said provisions of this code, said official may, in addition to any other remedies, penalties or means of enforcement request the department of law to make application on behalf of the city to any court of competent jurisdiction for an injunction requiring compliance with said provisions of this code or for such other order as the court may deem necessary or appropriate to secure such compliance. The department of law may then institute such proceedings on behalf of the City ***." Chicago Municipal Code § 13—12—070 (2003).

Sections 13—196—037, 13—20—040, and 13—96—860 of the Building Code also contain language that the building commissioner is to provide notice to building owners of violations and instruct them to effect necessary repairs. Chicago Municipal Code §§ 13—13—196—037, 13—20—040, 13—96—860 (2003, 2004, and 2003, respectively). The Building Code therefore requires that the City provide notice to building owners before filing suit and seeking injunctive relief.

The City's complaint sought injunctive relief requiring repair of the violations it alleged in counts II and III as well as fines for each day the defendants were found to be in violation of each provision of the Building Code. The City argues on appeal that notice was provided to defendants through the very existence of the Building Code and that defendants could not rely on failure to give notice as a defense because they failed to raise it at trial.

At trial, Fornell testified that she did not receive notice of the violations alleged in counts II and III until she received a copy of the City's amended complaint, several days after it was filed. Defendants also argued in their posttrial brief that the City could not seek fines because they had not provided proper notice to defendants. Again, defendants also provided evidence of prompt and dutiful compliance with the Code provisions alleged before trial even began, and the City stipulated as much.

While the City argues that ignorance of the law is no excuse and that defendants are bound to adhere to all provisions of the Code regardless of formal notice, we believe the City has just as strong an obligation to abide by the Code provisions requiring it to provide building owners with actual notice of violations before seeking equitable and legal relief through prosecution. Accordingly, we find that the trial court's finding on this matter was not erroneous.

Because we may uphold a trial court's decision on any basis appearing in the record, we need not reach the City's remaining arguments. *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 359-60 (1999). The judgment of the circuit court is affirmed.

Affirmed.

REID, P.J., concurs.

JUSTICE QUINN, dissenting:

After considering the City of Chicago's petition for rehearing and the first division of the First District's decision in *City of Chicago v. Cotton*, 356 Ill. App. 3d 1 (2005), I respectfully dissent from the majority's decision with which I earlier concurred.

The evidence in this case demonstrates that the condition of the building's roof and exterior walls violated the Building Code's provision that "[t]he foundation, exterior walls, and exterior roof *** shall be kept in sound condition and repair." Chicago Municipal Code § 13—196—530 (1999). Under the plain language of section 13—196—530, the City did not need to prove that the building's exterior admitted water or was dangerous and hazardous.

Similarly, the evidence in this case demonstrates that the subject building's fire escape was in violation of sections 13—160—070 and 13—160—080 of the Chicago Municipal Code. The evidence showed that the fire escape would not lower to street level because it was blocked by a canopy attached to an adjacent building. The majority are technically correct that "the cause of the condition was not attributable to defendants, who took prompt measures to alleviate the problem." 357 Ill. App. 3d at 347. However, the Building Code provides that "the owner, his agent *** and any other person managing or controlling a building *** shall be liable for any violation therein, existing or occurring, or which may have existed or occurred, at or during any time when such person is or was the person owning or managing, controlling, or acting as agent in regard to said buildings or premises." Chicago Municipal Code § 13—12—020 (2000). Under this provision, a building owner or manager is liable for any violation on the premises, regardless of who created the violation. The City acknowledges this is a form of strict liability, but argues that it "makes particular sense when fire exits are obstructed. Even if a building's owner or manager did not create an obstruction, they are properly placed under an obligation to ensure that the obstruction is removed promptly, before a fire or other emergency, requires an evacuation." I agree.

In its petition for rehearing, the City also relies on the holding in *City of Chicago v. Hadesman*, 17 Ill. App. 2d 150 (1958), which addressed the same ordinances that are at issue here and held that they

> "merely afford a course of procedure for administrative officials in the enforcement of city building, fire and health regulations and were not intended to supplant the historic right of a municipality to sue for a penalty for violation of its ordinances. There is nothing in the Municipal Code of Chicago which would give defendant the right to violate provisions of the Code until notified; its provisions clearly make a violation subject to fine. If we were to accept defendant's theory it would serve to encourage noncompliance without fear of suffering penalties until notice of violation had been served." *Hadesman*, 17 Ill. App. 2d at 156.

I completely concur with the holding and analysis of *Hadesman*.

Section 13—12—040 of the Chicago Municipal Code provides that "[a]ny violation of *** any of the provisions of this code *** shall be punished by a fine of not less than $200.00 and not more than $500.00, and each day such violation shall continue shall constitute a separate and distinct offense for which a fine as herein provided shall be imposed." Chicago Municipal Code § 13—12—040 (2005).

Section 13—12—040 was recently analyzed by this court in *City of Chicago v. Cotton*, 356 Ill. App. 3d 1 (2005). In upholding the mandatory nature of the fines imposed by section 13—12—040, the *Cotton* court relied on a long line of cases requiring courts to enforce statutes and ordinances as written and prohibiting courts from reading exceptions, limitations or conditions into the statutes and ordinances. *Cotton*, 356 Ill. App. 3d at 4-7, citing *Lawrence v. Regent Realty Group, Inc.*, 197 Ill. 2d 1, 10 (2001); *In re D.L.*, 191 Ill. 2d 1, 9 (2000); *Village of Spring Grove v. Kubat*, 201 Ill. App. 3d 991, 993 (1990); *City of Naperville v. Bernard*, 139 Ill. App. 3d 784 (1985); *City of Chicago v. Roman*, 184 Ill. 2d 504, 510 (1998); *City of De Kalb v. White*, 227 Ill. App. 3d 328, 330-31 (1992); and *City of Chicago v. Alessia*, 348 Ill. App. 3d 218 (2004). As do the majority, *Cotton* addressed the holding in *Village of Glenview v. Ramaker*, 282 Ill. App. 3d 368, 372 (1996): "Where cooperation is shown, compliance has come about, and imposition of a fine would not aid enforcement, a fine is improper." *Ramaker* considered at length whether a Vietnamese potbellied pig fell under the meaning of "swine" in a village ordinance and whether the ordinance was a proper exercise of the village's home rule powers. The court only briefly considered the amount of the fine and then relied on an Environmental Protection Agency case, which itself relied on cases interpreting an entirely different statutory scheme than the building code. At the time we heard oral arguments on this case, we did not

352

have the advantage of the well-reasoned decision in *Cotton*. After considering it, I believe that it controls. Accordingly, I respectfully dissent.