No. 2--08--0928

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE CITY OF McHENRY, | ) | Appeal from the Circuit Court of |
| | ) | McHenry County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 07--CH--1098 |
| | ) | |
| VERA ANN SUVADA, | ) | Honorable |
| | ) | Michael J. Caldwell, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the opinion of the court:

On September 12, 2007, plaintiff, the City of McHenry (City), filed a verified complaint against defendant, Vera Ann Suvada, seeking to enforce its municipal ordinances mandating the maintenance of residential property in a safe and habitable condition, the imposition of fines for each day that the subject property remained in violation, and an award of attorney fees. On September 20, 2007, the trial court entered a preliminary injunction against Suvada, requiring that all tenants evacuate the building while the property underwent repair. Approximately one year later, on September 28, 2008, the trial court found Suvada to be in compliance with the city code and declined to fine Suvada for any past violations or award attorney fees to the City. The City appealed. For the reasons that follow, we reverse and remand.

I. BACKGROUND

The subject property is a two-story, four-unit apartment building with brick on the lower level, siding on the upper level, and a mansard roof. Suvada has owned the property for 33 years. Suvada lives in Barrington, 21 miles away from the property. According to Suvada, she checks in on the property once or twice every two weeks, or when called.

On July 6, 2007, the daughter of a tenant called the City to complain about the condition of the property. The tenant was mainly concerned about a "failure" in her living room floor, mold growth, standing water in the basement, and a cracked rear sidewalk.

On July 9, 2007, Ryan L. Schwalenberg, the director of construction and neighborhood services for the City and a certified building inspector, inspected the subject property in response to the tenant's complaint. The tenant let in Schwalenberg; Suvada was not made aware of this inspection until after the fact. As he testified later at the hearing, Schwalenberg observed the following concerns: (1) significant sagging and bulging in the permanent wall and window area of the building; (2) bulging in the building's siding that was filled with caulk; (3) deteriorating exterior brick tuck-pointing; (4) missing siding, shingles, and caulk in the building's exterior; (5) a cracked rear sidewalk; (6) a sagging, spongy floor, depressed several inches along the living room wall of the building with accompanying deterioration in the floor sheeting, support, and insulation; (7) standing water in the basement and water stains on the basement appliances, walls, and electrical panels, indicating prior water levels; and (8) deteriorating electrical panels.

On July 11, 2007, the City's law firm, Zukowski, Rogers, Flood & McArdle, began billing for its work on the City's case against Suvada, according to the testimony of partner David W. McArdle. The firm had a strategy meeting the following day. McArdle testified that, from the

beginning, the firm set forth a litigation strategy, rather than a negotiation strategy. The firm billed 8.5 hours in July, 10.25 hours in August, and 44.75 hours total.

On July 17, 2007, the City sent Suvada a notice, which had the heading "Notice of Substandard and Dangerous Building." The notice stated that Suvada had until July 27, 2007 (10 days), to provide the City with a written report from a licensed architect or structural engineer regarding the repairs necessary to bring the building into compliance with the city code. The notice further stated that the City would provide Suvada with directions on whether the building should be vacated for safety reasons and the time frame in which the repairs should be completed. In closing, the notice stated, "[i]f you fail to provide a report by [July 27, 2007], the City will institute legal proceedings against you to vacate all occupants from the building."

In late July or early August, Suvada contacted the City in response to the notice. Suvada testified that four representatives from the City met her at the property to point out various code violations. Suvada stated that she felt "bombarded." The City informed Suvada that the first thing she should do is contact an engineer or an architect. The City also informed Suvada that if she failed to comply, the City would take legal action against her. Suvada testified that this ultimatum "stunned" her, because she felt she was cooperating with the City. Suvada further testified that she had a difficult time securing an architect; many were busy or did not want the job. Suvada testified that she called the City during this time to report that she was having difficulty securing an architect.

Meanwhile, on August 15, 2007, the City issued a second notice. This notice was substantively similar to the first, and it listed violations of the following code provisions: (1) McHenry Municipal Code (City Code) article XVII, sections 7--251(c), (d), (e), (h), (i), and (j)

(McHenry Municipal Code §§7--251(c), (d), (e), (h), (i), (j) (eff. December 4, 1987);[1] (2) International Property Maintenance Code 2000 (Maintenance Code) sections 108.1 and 108.2; (3) Maintenance Code chapter 3, sections 303.2, 304.2, and 304.3; and (4) Maintenance Code chapter 6, section 604.3.[2] The Maintenance Code had been adopted by city ordinance. The notice informed Suvada that she had until September 3, 2007 (20 days), to correct the referenced code violations and to provide the City with a written report from an engineer or an architect. In closing, the notice stated, "[i]f you fail to make all of the necessary repairs and provide a report by this date, the City will file and prosecute the enclosed complaint against you."

On September 12, 2007, the City filed a complaint entitled "Verified Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief[,] and Ordinance Violations." The complaint gave a brief description of the aforementioned code violations, as set forth below:

1. City Code section 7--251(c)--improperly distributed load upon floor or roof, causing the structure to have insufficient strength to be reasonably safe for the purpose used;

2. City Code section 7--251(d)--premises damaged so as to become dangerous to the lives, safety, morals, or general health and welfare of the occupants or people of the City;

3. City Code section 7--251(e)--premises dilapidated, decayed, unsafe, or unsanitary so as to work injury to the health, morals, safety, or general welfare of those living therein;

_____

[1]The initial notice had listed the McHenry Municipal Code violations as of article VI, sections 7--91(c), (d), (e), and (h).

[2]The full text of these codes was later admitted into evidence and is contained in the record on appeal.

4. City Code section 7--251(i)--defendant allowed the premises to become dilapidated, decayed, unsafe, unsanitary, or dangerous to the health, morals, safety, or general welfare of the people of the City;

5. City Code section 7--251(j)--defendant allowed the building on the premises to exist in violation of the codes and ordinances of the City;

6. Maintenance Code section 108.1--defendant knowingly allowed the structure on the premises to become dangerous to the lives, health, property, or safety of the public or the occupants of the structure because the structure is so damaged, decayed, dilapidated, or unsafe that the structure's partial or complete collapse is possible;

7. Maintenance Code section 108.2--defendant knowingly allowed the structure on the premises to be in such disrepair that the electrical wiring and electrical devices in the structure are a hazard to the lives, health, property, or safety of the public or the occupants of the structure;

8. Maintenance Code section 303.2--defendant failed to maintain the exterior surfaces of the structure on the premises;

9. Maintenance Code section 304.2--defendant failed to maintain the interior structural members of the building in a manner so as to be sound and capable of supporting imposed loads;

10. Maintenance Code section 304.3--defendant failed to maintain the interior surfaces of the structure in good, clean, and sanitary condition; and

11. Maintenance Code section 604.3--defendant allowed the electrical system in the structure to be in such a condition as to constitute a hazard to the occupants or the structure.

The City asked, among other requests, that the trial court: (1) issue a restraining order and injunction preventing the occupancy of the premises until the premises are found to be in compliance with the City Code; (2) enter an order, pursuant to section 11--217 of the City Code and section 11--31--1 of the Illinois Municipal Code (65 ILCS 5/11--31--1 (West 2006)), that the costs of enforcement, including attorney fees, shall be collected as a debt from Suvada and that such costs shall become a superior lien against the real estate on which the City may take legal action to foreclose; and (3) impose a fine of $750, pursuant to section 1--8(a) of the City Code, for July 6, 2007, and for each day after that the subject property is in violation of the City Code.

On September 13, 2007, the City filed a "Verified Motion for Preliminary Injunction." In it, the City referenced the complaint it had filed the day before and requested injunctive relief as had been stated in its earlier complaint.

On September 20, 2007, following argument wherein the City was represented by counsel and Suvada appeared pro se, the trial court granted the verified motion for preliminary injunction. The court stated that, based on the City's complaint, the City had a clear and ascertainable right to have the provisions of its codes and ordinances enforced in order to protect the public's health, safety, and welfare; the City would suffer irreparable harm if the preliminary injunction were not granted; the City had no adequate remedy at law; and there existed a reasonable likelihood of success by the City on the merits of its complaint. The court ordered that the premises shall not be occupied "until [the subject property is] in compliance with City Codes and Ordinances and/or a hearing has been held on [the] merits of the City's Verified Complaint." The court advised Suvada to retain an attorney, and she subsequently did so.

Also in September 2007, Suvada secured an architect. The architect completed the plans on September 19, 2007, as noted on the blueprint admitted into evidence. Suvada supplied the City with a copy of the building plans. On November 8, 2007, after the City approved the plans, Suvada submitted an application for a building permit. In December 2007, the City contacted Suvada to let her know the permit was ready. On January 9, 2008, Suvada picked up the permit from the City. Suvada testified that she did not pick up the permit in December 2007 because she did not believe there to be any hurry, as the weather was not conducive to construction. Suvada explained that performing concrete work on the building's exterior would prevent further interior damage and that, according to her contractors, it was best to perform concrete work in warmer weather. Suvada testified that she personally worked on the building during the winter months, cleaning its interior and its appliances. Schwalenberg disagreed that the interior repairs were conditioned on the exterior concrete work. However, Schwalenberg seemed to concede that much of the work, such as the concrete work, caulking, brick replacement, and deck support, was best left for warmer weather. Schwalenberg further conceded that the amount of work required to bring the property into compliance could not possibly have been completed in two to three weeks, as required by the notice dated August 15, 2007.

On January 23 and March 24, 2008, the case was continued for status. In late March and early April, according to Suvada, she and her contractors began working in earnest to correct the alleged violations. Between April 4 and September 3, 2008, the City inspected the subject property on seven occasions, monitoring Suvada's progress. Schwalenberg conducted each inspection, and he usually communicated with various contractors. Suvada was not present at each inspection. At the April 4, 2008, inspection, Schwalenberg informed the contractors that they needed to provide

additional pier support under the deck stairs and to better protect a gas line that was running through a hole in one of the piers. At the April 15, 2008, inspection, Schwalenberg spoke with a different contractor regarding the living room. The contractor had sufficiently framed the floor; however, the wood was still rotted around the window. Additionally, the building needed crawl space venting and further structural support, which could be accomplished by "nailing the bridging." At the May 14, 2008, inspection, Schwalenberg found the floor and the support beam to be fixed. However, as to the interior of the wall, the contractor needed to properly reroute the nonmetallic cable into the studs and install a moisture barrier and flashing behind the brick so as to prevent structural decay in the future. At the June 2, 2008, inspection, Schwalenberg noted that the wall in the living room around the window had been replaced. However, the contractor still needed steel stud guards on the electric wiring, a moisture barrier, and "weep holes" in the brick. At the June 17, 2008, inspection, Schwalenberg noted that the contractors had corrected the moisture barrier. At the August 25, 2008, inspection, Schwalenberg noted that the contractors still had to finish the caulking around the windows in the front and properly label the breakers. Everything else had been corrected. On September 3, 2008, Schwalenberg found no violations and issued certificates of occupancy for all four units. Schwalenberg testified that, throughout the inspection process, Suvada had at all times been cooperative.

Suvada testified that she was at times frustrated during the renovation process because Schwalenberg frequently found new violations that had not been noted previously and occasionally asked Suvada to redo a project in an inefficient manner. For example, Suvada stated that she asked Schwalenberg to inspect a wall to see if it was ready to be covered. Schwalenberg told Suvada to first put binding on the brick under the wall. Suvada did so and then covered up the wall. However,

Schwalenberg then required Suvada to take down the wall cover to do additional work. Schwalenberg testified that, while true that he noticed additional items to be repaired during his inspections, this was in large part due to contractor error.

On September 22, 2008, approximately one year after the trial court had granted the preliminary injunction, the case proceeded to a bench trial, wherein the above-stated testimony was set forth. Both parties acknowledged that the property was in compliance at that point. However, the City still requested that the trial court make a finding that Suvada had been in violation of the City Code and: (1) pursuant to section 1--8 of the City Code, impose a fine between $25 and $750 for each day the City alleged violations to have occurred on the property; and (2) pursuant to section 11--31--1 of the Illinois Municipal Code, award attorney fees and costs associated with prosecuting the City's verified complaint. When the City began to review the previous violations observed by Schwalenberg on July 9, 2007, the trial court interrupted:

"THE COURT: Mr. Chrzanowski, there is no issue here the building [was] in violation. How much more of this [do] we have to listen to?

MR. CHRZANOWSKI: (Indiscernable) [Y]our Honor--

THE COURT: I see you're taking papers off a stack that's about two inches thick. The issue here are the--the fines for violation and attorney fees, right?

MR. CHRZANOWSKI: Yes, [Y]our Honor.

THE COURT: You're going back to creation."

In closing, the City repeated the time line of events, implying that Suvada had taken an unreasonable amount of time to bring her property into compliance. The City requested that Suvada be fined for each day that her building had been in violation of the City Code. When the City

informed the trial court that the City Code provided for a maximum fine of $750 per day, the court interrupted:

> "THE COURT: $750 a day?
>
> MR. CHRZANOWSKI: That's correct, [Y]our Honor.
>
> THE COURT: For 300 days?
>
> MR. CHRZANOWSKI: That is correct.
>
> THE COURT: Do you have any idea how much money that is?
>
> MR. CHRZANOWSKI: Not without calculating it offhand.
>
> THE COURT: Well, at $20 a day it's over $6,000 and if you want $750 a day, it's a quarter of a million dollars.
>
> MR. CHRZANOWSKI: Your Honor, the code does set forth--
>
> THE COURT: I don't care what the code says. Is my math correct?
>
> MR. CHRZANOWSKI: If that's what [Y]our Honor--
>
> THE COURT: Is that what you're asking me to impose in this case, a fee or fine for this violation of $225,000, in excess of $225,000? Yes or no? Is that what you're asking me to impose? Don't tell me the violation existed, don't give me anymore lawyerly arguments, just answer my question. Yes or no?
>
> MR. CHRZANOWSKI: Your Honor, yes."

In closing, Suvada argued that she had been diligent and cooperative in making the required repairs. Suvada noted that there were no tenants in the building, so, even absent the imposition of fines, Suvada lost money in taking the time to correctly repair the property. Additionally, Suvada

argued that the attorney billings evinced unnecessary work, drafts for pleadings that were never used, and, in light of Suvada's cooperation, an overly aggressive litigation strategy.

The trial court ruled in favor of Suvada and against the City, declining to award the City statutory fines or attorney fees. In so finding, the trial court essentially reasoned that fines were not necessary in light of Suvada's cooperation and subsequent compliance. The court stated that Suvada had been reasonably diligent in repairing the property. The court noted that when the tenants were moved out of the property, the property no longer posed a public health hazard. The court further stated that there was no reason for the City to continue the suit following the issuance of the temporary injunction. Additionally, the court stated that it was not necessary or appropriate for the City to file its complaint under section 11--31--1 of the Illinois Municipal Code to secure Suvada's compliance. It seemed to the court that the City's sole reason for filing the complaint under section 11--31--1 was to secure attorney fees. The court noted that section 11--31--1, which allows the City to recover attorney fees incurred in prosecuting a case, applies only to situations where a municipality is required to demolish or repair property that is in a dangerous condition. The court stated that it would have been more appropriate for the City to file its case under section 11--31--2, which permits an injunction to require compliance with a regulation but does not contain a provision authorizing the City to recover attorney fees incurred in prosecuting the case. The court did not make an express finding that Suvada had violated the City Code at any point. This appeal followed.

## II. ANALYSIS

On appeal, the overriding issues are whether the trial court erred by failing to: (1) fine Suvada pursuant to sections 1--8(a) and 7--30(a)[3] of the City Code; and (2) award the City attorney fees and

---

[3]In its original complaint, the City relied only upon section 1--8(a) as a basis for the

costs. Additionally, the parties, citing to the trial court's statement that the City ought to have filed its complaint under section 11--31--2 (injunctions to require compliance where buildings fail to meet minimum standards of health and safety) rather than section 11--31--1 (demolition, repair, enclosure, or remediation of an unsafe building), broadly debate whether the instant lawsuit was necessary to secure Suvada's compliance. However, regardless of whether the City had cited section 11--31--1 or section 11--31--2, the City would have had, at the time it filed its complaint, a basis under sections 1--8(a) and 7--30(a) of the City Code for seeking a finding regarding the alleged violations and related fines. Thus, the question of section 11--31--1's applicability affects our analysis of only the second issue.

To the extent that the trial court's judgment relies upon the construction of a statute or an ordinance, such as sections 1--8(a) and 7--30(a) at issue here, our review is de novo. City of Chicago v. Old Colony Partners, L.P., 364 Ill. App. 3d 806, 812 (2006). However, the trial court's findings of fact, such as whether a building has violated the City Code, will stand unless contrary to the manifest weight of the evidence. Old Colony, 364 Ill. App. 3d at 812. A finding is against the manifest weight of the evidence if the opposite conclusion is clearly apparent. Old Colony, 364 Ill. App. 3d at 812.

A. Fines Pursuant to Section 1--8(a) and 7--30(a) of the City Code:

Subsequent Compliance is Not an Affirmative Defense

---

computation of fines. Prior to oral argument, we granted the City's application for leave to amend its complaint, pursuant to section 2--616(c) of the Code of Civil Procedure (735 ILCS 5/2--616(c) (West 2006)) and Supreme Court Rule 362 (155 Ill. 2d R. 362), to cite section 7--30(a) of the City Code as an additional basis for the computation of fines.

The City, relying on <u>Old Colony</u> and <u>City of Chicago v. Cotton</u>, 356 Ill. App. 3d 1 (2005), argues that the plain language of sections 1--8(a) and 7--30(a) of the City Code limits the trial court's role to determining whether an individual has violated a municipal ordinance and, upon such a finding, to imposing a fine within the prescribed range of $25 to $750 per day. We agree.

However, whereas section 1--8(a) applies generally to any violation of the City Code, section 7--30(a) applies specifically to the City's building code and is therefore the more appropriate basis for a fine. Section 7--30(a), which is contained within the building code chapter of the City Code, states:

"Any person who violates, disobeys, omits, neglects, <u>or</u> refuses to comply with <u>or</u> who resists the enforcement of any of the provisions in this Chapter, *** <u>or</u> who refuses to remedy a violation of any such provisions *** shall be punished by a fine of not less than $25.00 nor more than $750.00 and each day upon which such violation continues shall constitute a separate offense." (Emphasis added.) McHenry Municipal Code §7--30(a) (eff. December 4, 1987).

Section 1--8(a) states:

"[W]here no specific penalty is provided therefore [<u>sic</u>], the violation of any such provision of this Code or any ordinance shall be punished by a fine of not less than $25.00 nor more than $750.00. Each day any violation of any provisions of this Code or any ordinance shall continue shall constitute a separate offense." McHenry Municipal Code §1--8(a) (eff. December 4, 1987).

Section 1--8(a) applies "where no specific penalty is [otherwise] provided therefore." Section 7--30(a) provides a specific penalty for building code violations, technically rendering section 1--8(a)

inapplicable. In any case, both sections mandate a fine between $25 and $750 for each day that a defendant is found to be in violation.

The penalty provision at issue in both Cotton and Old Colony is substantially similar to section 7--30(a):

" '[V]iolation of *** any of the provisions of this [Building] Code ***, to which no other penalty provision is applicable[,] shall be punished by a fine of not less than $200.00 and not more than $500.00, and each day such violation shall continue shall constitute a separate and distinct offense for which a fine as herein provided shall be imposed.' " Cotton, 356 Ill. App. 3d at 7, quoting Chicago Municipal Code §13--12--040 (2003).

In Cotton, the City of Chicago filed a complaint against a landlord for violating portions of Chicago's building code. The landlord had neglected to pay the gas bills, causing his tenants to be without heat or hot water for 20 days and resulting in three building code violations. The trial court awarded damages in the amount of $2,000 based on a calculation of $100 per day for 20 days of noncompliance. Cotton, 356 Ill. App. 3d at 3. The appellate court determined that the trial court erred in deviating from the penalty range of the ordinance and held that the trial court was obligated, upon finding that the landlord violated the building code, to impose a daily fine within the statutory range of $200 to $500. Cotton, 356 Ill. App. 3d at 7. The court reasoned that a " 'statute must be enforced as written, and a court may not depart from its plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature,' " that the penalty statute at issue mandated a fine of $200 to $500 per day, and that the landlord's subsequent payment of the heating bill was not an affirmative defense. Cotton, 356 Ill. App. 3d at 4-7, quoting Lawrence v. Regent Realty

Group, Inc., 197 Ill. 2d 1, 10 (2001). The court remanded for the trial court to impose a fine of $200 to $500 per day. The appellate court left for the trial court a determination on the question of whether, as sought by the City of Chicago, a penalty was to be imposed for each code section violated, each day, irrespective of the extent to which each such violation was engendered by a common, single negative act, or, as the landlord would contend, a single penalty for each day, irrespective of the number of violations engendered by a single act. Cotton, 356 Ill. App. 3d at 10-11.

In Old Colony, the City of Chicago filed a complaint against the owner of a building, alleging violations of the building code with respect to the exterior walls of the building. Without much elaboration, the trial court found that the owner actually did not violate the code and declined to fine the owner. Old Colony, 364 Ill. App. 3d at 812. The appellate court stated that it was not against the manifest weight of the evidence to find that the defects at issue did not actually violate the code. Old Colony, 364 Ill. App. 3d at 821. However, the court stated, as it had in Cotton, that if there had been a violation, the penalty provision at issue mandated a fine and that subsequent compliance was not an affirmative defense. Old Colony, 364 Ill. App. 3d at 821.

At oral argument, Suvada's attorney argued that, in stating that those who "refuse[] to remedy a violation" are subject to fines, section 7--30(a) contemplates that those who do remedy a violation may be excused from fines. We disagree. Section 7--30(a) states that a person who violates or refuses to remedy a violation is subject to fines. A violation alone is sufficient to mandate a fine. See Cotton, 356 Ill. App. 3d at 4-5 (statute must be enforced as written and a court may not depart from its plain language by reading into it exceptions, limitations, or conditions not expressed by the

legislature). We find that, like the penalty provision in Cotton and Old Colony, the penalty provision at issue here mandates the imposition of a fine within the statutory range, provided the trial court finds a violation.

Additionally, Suvada, relying on City of Chicago v. RN Realty, L.P., 357 Ill. App. 3d 337 (2005), Village of Barrington Hills v. Life Changers International Church, 354 Ill. App. 3d 415 (2004), and Village of Glenview v. Ramaker, 282 Ill. App. 3d 368 (1996), essentially argues that her subsequent compliance was an affirmative defense to any fine the City may otherwise have been authorized to impose under section 7--30(a).

In Ramaker, the trial court fined the defendant $500 for keeping a pig as a domestic pet in violation of a municipal ordinance. Ramaker, 282 Ill. App. 3d at 370. Nine months prior to the village's complaint against her, the defendant had attempted to come into compliance by lobbying for a change in the ordinance to allow for the keeping of her pet's particular breed of pig. Additionally, the defendant removed her pig from the village pending the trial and the appeal. The appellate court focused its analysis on whether the pig at issue fell under the meaning of "swine" in the ordinance, and whether the ordinance was a valid exercise of police power. Cotton, 356 Ill. App. 3d at 7, discussing Ramaker, 282 Ill. App. 3d at 370-72. The appellate court then only briefly considered the $500 fine, calling it an "abuse of discretion." Ramaker, 282 Ill. App. 3d at 372. The court reasoned that the defendant cooperated with the village by removing the pig pending the trial and ultimately complied with the ordinance. Ramaker, 282 Ill. App. 3d at 372. The court stated that, "[w]here cooperation is shown, compliance has come about, and imposition of a fine would not aid enforcement, a fine is improper" and would constitute an abuse of discretion. Ramaker, 282 Ill. App.

3d at 372-73, citing <u>Harris-Hub Co. v. Pollution Control Board</u>, 50 Ill. App. 3d 608, 611 (1977). The court then imposed a nominal fine of $1. <u>Ramaker</u>, 282 Ill. App. 3d at 373.

Suvada's reliance on <u>Ramaker</u> is flawed on several fronts. First, though perhaps not fatal in and of itself, it is worth noting that the factual circumstances at play in <u>Ramaker</u>, <u>i.e.</u>, keeping a pet pig, are a far cry from those at issue here and in the building code violation cases relied upon by the City. Second, the village in <u>Ramaker</u> did not seek relief under a penalty provision similar to that in <u>Cotton</u> and <u>Old Colony</u> (section 13--12--040 of the Chicago Municipal Code), or the instant case (section 7--30(a)), each of which <u>mandates</u> a minimum fine and contains no language regarding subsequent compliance as an affirmative defense. Third, and perhaps most critical, <u>Ramaker</u> itself relies on misplaced authority. <u>Ramaker</u> relies on <u>Harris-Hub</u>, an environmental law case. At the time <u>Harris-Hub</u> was released, violating a provision of the environmental protection statute at issue did not necessarily warrant the sanction of a fine; in fact, the plaintiff alleging a violation of the statute was required to show that the imposition of a fine would aid in enforcing the enactment. <u>Harris-Hub</u>, 50 Ill. App. 3d at 611. Because the defendant in <u>Ramaker</u> was not accused of violating the environmental protection statute, the <u>Ramaker</u> court's reliance on the statutory scheme was questionable at best.

The remaining two cases cited by Suvada, <u>RN Realty</u> and <u>Life Changers</u>, each rely on <u>Ramaker</u> to some extent. See <u>RN Realty</u>, 357 Ill. App. 3d at 348; <u>Life Changers</u>, 354 Ill. App. 3d at 422. In <u>RN Realty</u>, for example, the court stated that "even if *** defendants were guilty of violating the cited Code provisions, they undertook immediate and diligent efforts to cure all the defects prior to trial and the Code was thus enforced," such that the imposition of fines would not

have aided in enforcement and would therefore have been improper. RN Realty, 357 Ill. App. 3d

at 348. We disagree with this approach. As reasoned by the courts in Cotton and Old Colony, the

plain language of the penalty provisions at issue does not excuse from fines those who violate the

City Code for a period of time yet subsequently comply. See also RN Realty, 357 Ill. App. 3d at 351

(Quinn, J., dissenting) (stating that Cotton should control over Ramaker and that section 13--12--040

mandated fines). To the extent that Suvada relies on Ramaker, RN Realty, and Life Changers for

the proposition that a defendant who violates the City Code for a period yet subsequently complies

prior to the hearing on the complaint is no longer subject to a fine, we disagree.

Of course, section 7--30(a) is implicated only if the trial court makes a finding that the

building was, at least at some point, in violation. Whether a building is in violation of the City Code

and how long the building stands in violation are questions of fact, and a trial court's determination

is not to be disturbed unless it is against the manifest weight of the evidence. Old Colony, 364 Ill.

App. 3d at 821. Additionally, where the code at issue uses general terms and/or language that is

open to interpretation, such as "dangerous and hazardous," the trial court must exercise its discretion

to determine whether the state of the building should constitute a violation. Old Colony, 364 Ill.

App. 3d at 815.

The City argues that the undisputed evidence requires the trial court to make a finding that

the property remained in violation of the City Code for the 422-day period between Schwalenberg's

initial inspection of the property on July 9, 2007, and the City's issuance of a certificate of occupancy

following Schwalenberg's final inspection on September 3, 2008. The City notes that, when it

attempted to question Schwalenberg at the hearing regarding each specific ordinance violation, the

trial court interrupted and stated that such testimony was unnecessary because "there is no issue that the building [was] in violation." The City further notes that Suvada stipulated that the property was in the condition testified to by Schwalenberg and states that a stipulation has the effect of eliminating the need for proof that would have otherwise been required. People v. One 1999 Lexus, VIN JT8BH68X2X0018305, 367 Ill. App. 3d 687, 691 (2006).

Though it may seem obvious that the property was, at some point, in violation of the City Code, we still must remand to the trial court to make a specific finding of fact. Both the trial court's statement regarding the fact that there was "no issue" that the property was in violation and Suvada's stipulation were made in reference to the condition of the property on July 9, 2007, only. We also disagree that the trial court was required to find that the property was in violation of the City Code for the entire 422-day period. Whether, when, and the nature and extent of the violation are questions of fact for the court to determine.

In sum, as to the issue of fines, we find that the plain language of section 7--30(a) of the City Code mandates a fine between $25 and $750 for each day that the property was in violation. However, contrary to the City's position, we do not believe the trial court is required to find that the property remained in violation during the entire 422 days. We remand for the trial court to make an express finding as to the number of days that Suvada remained in violation and to impose a reasonable fine within the statutory guidelines.

### B. Attorney Fees

The City argues that, pursuant to the plain language of section 1--8(b) of the City Code and section 11--31--1 of the Illinois Municipal Code, it is entitled to $10,458.50 in attorney fees and

costs in prosecuting this case. McHenry Municipal Code §1--8(b) (eff. December 4, 1987); 65 ILCS 5/11--31--1(a) (West 2006). For the reasons that follow, we find that section 1--8(b) is not applicable and that section 11--31--1, though applicable, entitles the City to recover only those attorney fees and costs that the trial court deems reasonable or "related to" the suit.

Section 1--8(b) of the City Code states:

"In the event any charge or fee, including *** fines ***, found in any section of the [City Code], <u>that</u> <u>is</u> <u>due</u> <u>the</u> <u>City</u> <u>and</u> <u>is</u> <u>not</u> <u>paid</u>, the cost of collecting said fee and enforcing the ordinance shall be added to the fee. Collection and enforcement costs shall include, but not be limited to, prosecution and attorney fees incurred by the City of McHenry." (Emphasis added.) McHenry Municipal Code §1--8(b) (eff. December 4, 1987).

Suvada does not question, or even address, section 1--8(b)'s applicability; however, we do. Section 1--8(b) states that where fines are "due the City" and are not paid, the cost of collecting the fines and of enforcing the ordinance will be added to the fines. McHenry Municipal Code §1--8(b) (eff. December 4, 1987). Here, the trial court has yet to make its determination regarding fines "due the City." Suvada has never refused to pay fines ordered and the City has not yet incurred costs collecting fines ordered. Section 1--8(b) does go on to state that "the cost of collecting said [fine] and enforcing the ordinance shall be added to the [fine]," suggesting that section 1--8(b) allows the City to recover not only the cost of collecting an unpaid fine but also the cost of enforcing the ordinance from which the fine resulted. McHenry Municipal Code §1--8(b) (eff. December 4, 1987). However, if read with strict attention to the rules of sentence construction, section 1--8(b) actually limits the City's ability to recover enforcement costs to those situations where "fines *** due the city

[are] not paid." Thus, our primary holding as to section 1--8(b) is that it does not apply to the instant case. However, even if we read section 1--8(b) to provide for the recovery of enforcement costs in all circumstances, it would still be up to the trial court to determine which costs claimed by the City were reasonably related to enforcement of the ordinances.

The City contends that prosecution of the instant suit was necessary under section 11--31--1(a) of the Illinois Municipal Code to "cause the *** repair *** of a dangerous and unsafe building." 65 ILCS 5/11--31--1(a) (West 2006). Section 11--31--1(a) further states that the City is entitled to an award of its attorney fees and costs "related to [its] enforcement of [the] Section" and that the recovery of said fees and costs shall become a superior lien on the property. 65 ILCS 5/11--31--1(a) (West 2006).

Suvada does challenge section 11--31--1's applicability. Suvada notes that the trial court stated that the City ought to have filed its complaint under section 11--31--2 (injunctions to require compliance where buildings fail to meet <u>minimum</u> <u>standards</u> <u>of</u> <u>health</u> <u>and</u> <u>safety</u>) rather than 11--31--1 (demolition, repair, enclosure, or remediation of an <u>unsafe</u> building). She argues that a lawsuit under section 11--31--1 was not appropriate because: (1) the City failed to provide sufficient evidence to support a finding that a dangerous and unsafe condition existed on the property, as opposed to a finding that the property failed to meet the minimum standards of health and safety (65 ILCS 5/11--31--1(a) (West 2006) ("dangerous and unsafe [condition]"); 65 ILCS 5/11--31--2(a) (West 2006) ("minimum standards of health and safety")); and (2) no urgency existed to require Suvada to comply with the City Code where she cooperated with the City throughout the repair process (City of Aurora v. Meyer, 38 Ill. 2d 131, 134 (1967) (relief under section 11--31--1 is an

extreme measure limited by the necessity of the case); City of Chicago v. James E. Mulligan Enterprises, Inc., 27 Ill. App. 2d 481, 487 (1960) (section 11--31--1 for use in urgent situations)). Of course, if the City's prosecution of the instant suit under section 11--31--1 were inappropriate, then the City would not be entitled to an award of its attorney fees and costs "related to [its] enforcement of [section 11--31--1]." 65 ILCS 5/11--31--1(a) (West 2006). By way of comparison, section 11--31--2 does not contain a clause regarding the City's entitlement to an award of its attorney fees and costs related to its enforcement of that section. 65 ILCS 5/11--31--2 (West 2006). Additionally, Suvada argues that, even if prosecution under section 11--31--1 were appropriate, the fees incurred by the City were not reasonably necessary, in that the City aggressively pursued the litigation and incurred fees relating to the preparation of documents that were never filed with the court.

As to Suvada's contention that the City did not provide sufficient evidence to support a finding that a dangerous and unsafe condition existed on the property, the trial court here did make the express finding that "upon the vacation of the property by the tenants[,] *** this building did not pose any public health hazard." However, the trial court also stated that, had tenants lived in the building, as they had when the City initially filed the suit, the tenants would have been "at risk." These findings are not against the manifest weight of the evidence.

We were unable to find any case law that directly addresses the issue of whether a suit is more properly filed pursuant to section 11--31--1 or section 11--31--2. The purpose of section 11--31--1 is to give the City a quick and effective means of removing those unused and dilapidated structures that present danger and blight. Mulligan, 27 Ill. App. 2d at 487. However, the

"implication of [section 11--31--1] is that if the property at issue can be repaired with comparatively little expense[,] the city ought to adopt this course rather than complete demolition." (Emphasis added.) Meyer, 38 Ill. 2d at 137. The Meyer court further stated that "[t]here are many kinds of deficiencies which would render a building dangerous and unsafe, but which can readily be obviated by appropriate repairs." Meyer, 38 Ill. 2d at 137. The Meyer court then provided examples of deficiencies that could be serious enough to sustain a finding that the building was dangerous and unsafe but could be readily repaired, such as inadequate wiring or a weakened support beam. Meyer, 38 Ill. 2d at 137. Implicit in the Meyer court's admonishment that cities should seek repairs under section 11--31--1 before they seek demolition is an acknowledgment that section 11--31--1 is an appropriate vehicle by which to compel repair.

Incidentally, we note that prior cases under section 11--31--1 do indeed involve more "urgent" situations than that demonstrated by the facts of the instant case. See, e.g., Meyer, 38 Ill. 2d at 133-34 (building was open to vagrants who built fires therein, was filled with trash and debris, and was alleged to have faulty electrical wiring, structural defects, unsanitary plumbing, and unsafe floors, walls, roof, and windows); Mulligan, 27 Ill. App. 2d at 487 (the city "proceeded far more leisurely than the urgency of the statute contemplated" where it waited 14 months following the defendant's answer to its complaint before it sought the demolition of the property at issue, which had been ravaged by a fire and left unrepaired). Nevertheless, given the examples cited by the Meyer court, we cannot fault the City for initially relying on section 11--31--1 to compel the repair of the property's structural and water damage. These deficiencies were severe enough to require all tenants

to vacate the building, not just the tenant in the unit that had damage to the interior of the living room.

That the City reasonably relied upon section 11--31--1 to compel Suvada to repair the property, however, does not necessarily mean that it is entitled to $10,458.50 in attorney fees and costs. The municipality seeking to recover from a building owner the expenses it incurred in compelling the repair of a building, pursuant to section 11--31--1, has the burden of proving that the expenses were reasonable. See Village of Franklin Park v. Aragon Management, Inc., 298 Ill. App. 3d 774, 778 (1998) (applying this principle to the demolition of a building). It is within the discretion of the trial court to determine what costs are reasonably "related to" the suit. Aragon Management, 298 Ill. App. 3d at 778.

Typically, the decision to award attorney fees is within the trial court's discretion. Aragon Management, 298 Ill. App. 3d at 777 (municipal code provision allowing a municipality to demolish a building and to recover costs "related to" enforcement of the provision leaves it to the discretion of the court, applying court rules and the principles applicable to similar statutes such as the Mechanics Lien Act (770 ILCS 60/1 et seq. (West 1996)), to determine which costs are so related). Here, the trial court was fairly adamant in its language that the City pursued an overly aggressive litigation strategy against Suvada in light of Suvada's cooperation and that legal action was not necessary to secure Suvada's compliance. Nevertheless, the trial court did not even consider what the correct amount of attorney fees and costs should have been, because it (erroneously) thought that section 11--31--1 did not apply at any point in the proceedings, despite the fact that, in granting the preliminary injunction, it had stated that the City's complaint filed under section 11--31--1 had a

reasonable likelihood of success on the merits. Where, as here, the trial court fails to even consider the amount of attorney fees and costs warranted, a remand is proper. See O'Conner Construction Co. v. Belmont Harbor Home Development LLC, 391 Ill. App. 3d 533, 541 (2009) (remand for a hearing on attorney fees where the trial court refused to consider the amount of attorney fees to which plaintiff was entitled under the Mechanics Lien Act).

### III. CONCLUSION

For the aforementioned reasons, we reverse the trial court's judgment in favor of Suvada and remand for a determination of fines and attorney fees and costs.

Reversed and remanded.

McLAREN and O'MALLEY, JJ., concur.